**COOPER PETROLEUM COMPANY et al.,**
Petitioners,

v.

**LaGLORIA OIL AND GAS COMPANY,**
Respondent.

No. B–795.

Supreme Court of Texas.

Jan. 22, 1969.

Fulbright, Crooker, Freeman, Bates & Jaworski, Dan G. Matthews, John A. Croom and Chester M. Fulton, Houston, for petitioners.

Vinson, Elkins, Weems & Searls, John C. Snodgrass and John B. Holstead, Houston, for respondent.

WALKER, Justice.

This suit by LaGloria Oil and Gas Company against Cooper Petroleum Company and Albert E. Fagan is based upon alleged guaranties of accounts owing by International Marketing, Inc. (I.M.I.) to LaGloria. The trial court rendered judgment on the verdict in favor of LaGloria against Cooper Petroleum for $159,881.90 and against Fagan for $136,429.93. The Court of Civil Appeals affirmed. 423 S.W.2d 645.

The only question brought here that might affect the judgment against Cooper Petroleum is a contention that the trial court erred in admitting the documentary evidence offered by LaGloria to prove the indebtedness owing by I.M.I. Cooper Petroleum guaranteed in writing, and LaGloria had been orally promised that Fagan would guarantee in writing, payment of the purchase price of petroleum products sold by LaGloria to I.M.I. pursuant to certain contracts. LaGloria offered into evidence and the trial court admitted: (1) Plaintiff's Exhibit 5, which was a box of LaGloria invoices purporting to cover sales to I.M.I.; and (2) Plaintiff's Exhibit 4, which was a demand letter from LaGloria to Cooper Petroleum with an attached list of the invoices prepared by someone acting for LaGloria. The latter not only lists the dates, numbers and amounts of the invoices but also purports to show the amounts that should be charged to Cooper Petroleum and to Fagan under their respective guaranties.

Defendants objected to Exhibit 4 on the ground that it was a self-serving letter written by LaGloria to Cooper Petroleum. This objection apparently was directed at one paragraph of the letter, which was excluded by the trial court. The remainder of the letter and the attached list of invoices were admitted. Petitioners objected to Exhibit 5 as hearsay and on the ground that a proper predicate had not been laid for the introduction of the invoices as business records. The Court of Civil Appeals reasoned that since the list of invoices was admitted without objection, any error of the trial court in admitting Exhibit 5 was harmless.

We recognize that a tabulated schedule or summary of voluminous records may, in the discretion of the trial court, be admitted to expedite the trial and aid the trier of fact. See Wigmore on Evidence, 3rd ed. 1940, § 1230. This rule assumes that the records themselves are admissible. The tabulated statement tends to prove nothing except the contents of the records it purports to summarize. If the invoices constituting Exhibit 5 were improperly admitted, the list of invoices prepared for making demand on Cooper Petroleum is hearsay and has no probative value. Aetna Insurance Co. v. Klein, 160 Tex. 61, 325 S.W.2d 376; Texas Co. v. Lee, 138 Tex. 167, 157 S.W.2d 628; Henry v. Phillips, 105 Tex. 459, 151 S.W. 533.

The question then is whether a proper predicate was laid for admission of the invoices as business records in accordance with Article 3737e, Vernon's Ann.Tex.Civ. Stat. This statute creates an exception to the hearsay rule and makes a "memorandum or record of an act, event or condition * * * competent evidence of the occurrence of the act or event or the existence of the condition" provided the identity and mode of preparation of the memorandum or record are established as provided therein. Respondents offered the testimony of Bruce A. Jones, general manager of sales for LaGloria, to show that the invoices met the requirements of Article 3737e. The witness could not say that the invoices are accurate, but he did state that they were kept in the regular course of LaGloria's business. His testimony further shows that they were prepared by employees in the office manager's group and are "based upon delivery tickets" delivered or sent "from our rack to the office manager's group."

Before a business record may be admitted under Article 3737e, the proponent must show, among other things, that:

"(b) It was the regular course of that business for an employee or representative of such business with personal knowledge of such act, event or condition to make such memorandum or record or to transmit information thereof to be included in such memorandum or record."

As we observed in Skillern & Sons, Inc. v. Rosen, Tex.Sup., 359 S.W.2d 298, "some employee or representative who either made the record or transmitted the information to another to record must have had *personal knowledge* of the act, event or condition in order for such record to be admissible under the business records exception to the hearsay rule." It is clear that the invoices here were not prepared by someone with personal knowledge of all relevant information appearing thereon, and there is no evidence that it was the regular course of LaGloria's business for one or more of its employees who had personal knowledge of that information to transmit the same for inclusion in the invoices. Under the present record, therefore, neither the invoices nor the list constitutes competent proof of the sales to I. M.I. There is no other evidence to support the jury's findings as to the amount of indebtedness covered by the alleged guaranties, and the judgment of the trial court must be reversed.

LaGloria's claim against Fagan is based on an oral promise made by Fagan's son-

in-law, Clark, that Fagan would give La-Gloria a letter of guaranty. Fagan has a number of points of error which, if sustained, might require a rendition of judgment in his favor. They raise questions of apparent authority, extoppel to deny authority, applicability of the Statute of Frauds, and estoppel to plead the Statute of Frauds. A rather detailed statement of the facts giving rise to the suit is necessary.

LaGloria is a producer, refiner and processor of petroleum products. Cooper Petroleum is in the business of marketing these products, buying them from producing companies and reselling to its customers. Fagan is President of Cooper Petroleum. He and his wife and children own all of its stock. His son-in-law, James A. Clark, is Vice-President of Cooper Petroleum and Vice-President of I.M.I.

I.M.I. is another corporation engaged in the business sof buying and selling petroleum products. It was organized in 1959, and its stock was originally owned equally by Clark and D. Truitt Davis. By 1962 I.M.I. was doing a substantial amount of business with Cooper Petroleum, perhaps $100,000.-00 per month. It was in need of additional working capital, and in May, 1962, Fagan purchased one-fourth of the capital stock. The remainder of the stock was owned one-third each by Clark, Davis and Frank Wood. Cooper Petroleum loaned Clark, Davis and Wood $7,500.00 each, and their stock in I.M.I. was pledged to Cooper Petroleum as security for the loans. By December, 1963, Fagan had given his stock in I.M.I. to a son and another son-in-law.

At the request of Fagan and Clark, LaGloria began selling gasoline to I.M.I. on credit. In September, 1962, I.M.I. contracted to furnish Cooper Petroleum a large amount of gasoline each month to enable the latter to fulfill its contract with Slick Airways. About two months later I.M.I. was awarded a contract to supply aviation gasoline to the United States Government. On each occasion it negotiated with LaGloria for the required gasoline. Since substantial sales were involved, Mr. Jones of LaGloria talked with Clark about I.M.I.'s credit and was assured orally that Cooper Petroleum would guarantee payment of I.M.I.'s account. On the basis of these representations, LaGloria agreed on each occasion to supply the gasoline required by I.M.I. and began making deliveries. The promised guaranties were not furnished promptly, but on or about February 1, 1963, LaGloria received a letter from Cooper Petroleum guaranteeing "payment at maturity of whatever amounts shall at any time be owing to you on deliveries" under the two contracts between LaGloria and I.M.I. The letter was signed for Cooper Petroleum by Clark as Vice-President and was witnessed by the Secretary.

Substantially the same sequence of events occurred in connection with another Government contract which I.M.I. was awarded in about May of 1963. After numerous telephone calls from Mr. Jones of LaGloria, Cooper Petroleum mailed a second letter of guaranty on September 26, 1963. This second letter was signed in the same manner and contained the same form of guaranty as the first. It covered gasoline furnished to I.M.I. to enable it to fulfill its contract with Cooper Petroleum and the second Government contract.

This brings us to the transactions that are the basis of LaGloria's claim against Fagan individually. By purchase order dated July 22, 1963, I.M.I. confirmed the purchase from LaGloria of 75,000 to 100,-000 gallons of light alkylate per month. On August 1, 1963, LaGloria further agreed to sell I.M.I. approximately 200,000 gallons of 100 RON motor gasoline per month. I.M.I. was awarded a third contract to supply aviation gasoline to the Government, and on December 16, 1963, LaGloria agreed to sell and I.M.I. agreed to buy a maximum of 5,480,000 gallons of gasoline to service this contract.

I.M.I. fell behind on the payment of its accounts with LaGloria. In mid-December of 1963 the responsible officials of La-Gloria decided that I.M.I.'s unpaid account of approximately $250,000.00 was so large that LaGloria needed collateral in addition to the Cooper Petroleum guaranty. Mr. Kane of LaGloria talked with Clark and requested the latter to secure from Fagan a personal letter of guaranty covering the light alkylate contract, the 100 RON motor gasoline contract and the third Government contract. Clark assured Kane that Fagan would sign the requested letter of guaranty. On January 3, 1964, LaGloria mailed Clark a written request for Fagan's personal guaranty and enclosed a form letter to be signed by Fagan. The written guaranty was never signed. Clark continued to assure LaGloria that Fagan would sign the requested guaranty, and LaGloria began making credit sales to I.M.I. in connection with the third Government contract.

On January 23, 1964, Fagan and Clark met Jones and Kane of LaGloria for lunch. During this meeting Fagan advised that I.M.I. was having difficulty obtaining insurance because of a truck accident and that he wished to have I.M.I.'s contracts with LaGloria transferred to Cooper Petroleum. Kane and Jones agreed to the proposal. A written contract was subsequently executed by LaGloria and Cooper Petroleum providing for the sale to the latter of the products covered by the 100 RON motor gasoline contract, the light alkylate contract, the third Government contract, and the contract to supply aviation gasoline for Slick Airways. Cooper Petroleum thereafter paid I.M.I. certain commissions on the contracts, but this could have been as little as $2,500.00.

Aside from its contracts, the principal assets of I.M.I. were the stock of Trans-Texas Transport, Inc., a wholly owned subsidiary, and office furniture. Trans-Texas owned an I.C.C. or Railroad Commission permit and an equity in a large number of trucks. The stock of Trans-Texas had been acquired by I.M.I. at a cost of $110,000.00. On January 28, 1964, Fagan contracted with I.M.I. to purchase the Trans-Texas stock for $110,000.00, payable as follows: $11,000.00 in cash and a note for $99,000.00 maturing in two years. It was stipulated, however, that the note would contain a provision suspending the due date, and that the note would not bear interest, so long as Fagan or Cooper Petroleum was on any guaranty agreement for I.M.I.'s benefit. The $11,000.00 cash payment was made. Shortly thereafter I. M.I. paid Trans-Texas $9,000.00 on account. Fagan also purchased an outstanding lien on the assets of Trans-Texas and foreclosed the same. By purchase at the foreclosure sale, he and other members of his family acquired the trucks and the permit.

On February 27, 1964, LaGloria was informed by Clark that the liabilities of I.M. I. exceeded its assets by $100,000.00 and that I.M.I.'s accounts could not be paid. I.M.I. was subsequently adjudged a bankrupt and a trustee was appointed. When it became apparent that LaGloria could not recover its debts out of the assets of I.M. I., demand was made for performance of the guaranty agreements involved in this suit.

In response to the issues relating to Fagan's liability, the jury found: (7) that it was to the direct financial interest and benefit of Fagan that LaGloria deliver products to I.M.I. in December, 1963, and January, 1964; (8) that in the latter part of December, 1963, Clark, purporting to act for Fagan, represented that Fagan would guarantee payment to LaGloria for all products delivered to I.M.I.; (9) that on or before January 4, 1964, Fagan knew that Clark had made such representation; (12) that Fagan failed to notify LaGloria until January 23, 1964, that he would not execute a guarantee of payment; (13) that on or before January 4, 1964, Fagan knew that LaGloria would deliver products to I.M.I. in reliance upon Clark's representation that Fagan would guarantee payment; (14–15) that LaGloria believed Clark's

894

representation and delivered products to I. M.I. in reliance thereon; and (17) that a reasonable person in Fagan's position would, in the exercise of ordinary regard for the interests of others, have notified LaGloria that he would not execute the written guarantee. The jury further found that $136,429.93 was unpaid on the accounts covered by the promised letter of guaranty.

LaGloria does not contend that Clark had actual authority to make the promise on Fagan's behalf. The jury has not found that he had apparent authority, and there is no evidence that he was ever held out by Fagan as having authority to act for him individually. If Fagan is bound by Clark's promise, it must be on the theory that he is estopped to deny Clark's authority.

Fagan correctly points out that it is the conduct of the one sought to be estopped that must induce reliance by the one asserting estoppel. He then says that his silence after learning of Clark's promise cannot give rise to an estoppel because there is no evidence that LaGloria was aware that he knew of the promise. We do not agree. In view of the business and family relationship between Fagan and Clark, LaGloria could reasonably expect Clark to inform Fagan of the promised guaranty. It could have been misled by Fagan's silence even though it did not know whether Fagan knew of the promise. When Fagan learned of the promise that had been made in his behalf, it was his duty under the circumstances to take reasonable steps to notify LaGloria of the true facts. Any detrimental change of position on the part of LaGloria in reliance upon his failure to speak would thus estop him from denying Clark's authority. See Restatement, Second, Agency § 8B. See also A. R. Clark Inv. Co. v. Green, Tex. Sup., 375 S.W.2d 425; Johnson v. Sovereign Camp, W.O.W., 125 Tex. 329, 83 S. W.2d 605; Burnett v. Atteberry, 105 Tex. 119, 145 S.W. 582.

Since the case must be tried again, it is unnecessary for us to determine whether, as LaGloria contends, a finding of reliance on Fagan's silence is deemed to have been made by the trial court in support of the judgment. See Rule 279, Texas Rules of Civil Procedure. We do say that if the issue is raised but not conclusively established by the evidence at the second trial, it should be submitted to the jury. See Petroleum Anchor Equipment Company, Inc. v. Tyra, Tex.Sup., 419 S.W.2d 829.

Fagan was under no duty to speak until he learned of the promise, and there could be no detrimental reliance after he spoke. In this connection, we note that the judgment against him includes charges for deliveries to I.M.I. before January 4th and after January 23rd. The jury found that he learned of the promise on or before January 4th, and that he did not notify LaGloria that he would not execute the guaranty until January 23rd. The critical dates should be definitely established by the evidence and the findings at the second trial. If there is some other theory on which he can be bound by the promise before learning of it or after repudiating the same, LaGloria will have an opportunity to develop the facts.

Our next question is whether Fagan's guaranty is within the Statute of Frauds. The charge as submitted to the jury included Special Issues Nos. 11 and 12, which inquired whether Fagan affirmed the act of Clark in representing to LaGloria that Fagan would make the guaranty, and whether it was for the main purpose of serving his own financial interest that Fagan affirmed the representation. These issues were not answered, and the trial court's judgment states that they were withdrawn from the jury by agreement of the parties. The Court of Civil Appeals reasoned that Special Issue No. 12 was implied found by the trial court in the affirmative so as to support the judgment. It then concluded that under the so-called "main purpose" doctrine, the oral promise

is not within the Statute of Frauds. We do not agree.

It was held in Gulf Liquid Fertilizer Company v. Titus, 163 Tex. 260, 354 S.W. 2d 378, that the main purpose doctrine is applicable in Texas. This doctrine, also called the leading object rule, was devised by the courts as a means of excluding from the operation of the statute cases which do not fall within its purpose and spirit. Probably the basic reason for requiring that a promise to answer for the default of another be in writing is that the promisor has received no direct benefit from the transaction. When the promisor receives something, this is subject to proof and tends to corroborate the making of the promise. Perjury is thus more likely in the case of a guaranty where nothing but the promise is of evidentiary value. The lack of any benefit received by the promisor not only increases the hardship of his being called upon to pay but also increases the importance of being sure that he is justly charged. Williston on Contracts, 3rd ed. 1960, § 452.

The theory of the main purpose rule is that where the promise is made for the promisor's own benefit and not at all for the benefit of the third person, the reason for the statutory provision fails and the promise should be enforced. See Davis v. Patrick, 141 U.S. 479, 12 S.Ct. 58, 35 L.Ed. 826. The rule has been stated as follows: "When the leading object of the promise or agreement is to become guarantor or surety to the promisee, for a debt for which a third party is and continues to be primarily liable, the agreement, whether made before or after, or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute." Nugent v. Wolfe, 111 Pa. 471, 4 A. 15; 2 Corbin on Contracts, 1950 ed., § 366.

Professor Williston points out that the distinction suggested by this and other statements of the rule is easily subject to misapprehension. 3 Williston on Contracts, 3rd ed. 1960, § 470. He explains that:

"The purpose or object of the promisor is always to acquire the consideration for which the promise is exchanged; that is why he gives his promise, not because his promise itself has a purpose; and if he wants the consideration enough, he will give the kind of promise for it that the promisee desires. Therefore, it is perfectly possible for a promisor to have as his leading purpose the 'gaining of some advantage' or 'promotion of some interest of his own' by becoming 'a mere guarantor or surety of another's debt.'

"The real distinction of purpose or object which it is sought to bring out is doubtless that between intending that the consideration for which the promise is given shall benefit the promisor himself, or shall benefit a third person, the co-debtor.

\*　\*　\*　\*　\*　\*

"Even when the matter is carefully stated and understood it is to be observed that the promisor's intention with respect to the consideration can be distinguished only by considering whether the consideration was in fact to be received by and become advantageous to the promisor, or was to be received by and be beneficial to another.

\*　\*　\*　\*　\*　\*

"This characteristic of the consideration given for a promise, therefore, furnishes more exactly and simply than the promisor's supposed purpose, the test presumably sought by those who inquire into that purpose. Thus understood, this test is open only to such criticism as is made hereafter of dicta directly adopting as a test the beneficial character of the consideration."

Our opinion in *Titus* quotes the following from Corbin on Contracts, 1950 ed., § 367, with the emphasis indicated:

"The 'leading object' that is sufficient to take a promise out of the statute must be found in the consideration for the promise and not in the promise itself or in the result of its performance. The promise is itself a promise to a creditor to pay a debt due to him from a third party; if it is not such a promise, it is certainly not within the statute. The performance of the promise will clearly benefit the creditor; and it will benefit the debtor too by discharging his duty to the creditor. * * * The *promisor* is not in the least benefited by the performance of his own promise. *In order to take his promise out of the statute, he must be bargaining for a consideration that is beneficial to himself and that constitutes his primary object of desire.*"

In applying the main purpose doctrine then, we must look to the consideration that was received for the promise and determine: (1) whether the promisor obtained, *as part of that consideration,* a benefit accruing directly to him personally; and (2) if so, whether the obtaining of that benefit was his main purpose for making the promise. LaGloria insists that Fagan's main purpose was to obtain a direct and immediate benefit to himself, because the consideration he bargained for and received was the large amount of credit LaGloria extended to I.M.I., which allowed I.M.I. to continue its operations until Cooper Petroleum received substantial payments from I.M.I. and until Fagan and his family had stripped I.M.I. of all its valuable assets. It says that Fagan bargained for time and that he received time at its expense. We do not agree.

LaGloria promised nothing in return for Fagan's guaranty. There was no promise of forbearance, and LaGloria was free to institute legal proceedings against I.M.I. whenever it wished. Fagan may have gained time as one of the consequences of the guaranty, but that was not part of the consideration for which his promise was given. The only consideration for the guaranty was the continued sale of products to I.M.I. on credit. This was primarily for the benefit of I.M.I., and there was no direct benefit of any kind accruing to Fagan personally. He had disposed of his stock in I.M.I. at the time, and the only benefit he received from the continued sales to I.M.I. on credit was as one of the stockholders of Cooper Petroleum. This benefit, which was shared with the other stockholders of that company, is too remote and indirect to render the promise enforceable as an original undertaking. We hold that the promised guaranty is within the Statute of Frauds. See Annotation, 35 A.L.R.2d 906; 2 Corbin on Contracts, 1950 ed., § 372.

According to the evidence and the jury's findings, the promise was to sign a written guaranty, and a written guaranty would have been enforceable. In previous dealings LaGloria had acted on oral promises that Cooper Petroleum would guarantee payment of I.M.I.'s accounts, and the written guaranties were furnished later. The promise in this instance was given for the purpose of inducing and it did induce LaGloria to continue making sales on credit to I.M.I. On the present record it is clear that injustice can be avoided only by enforcing the promise. Under the doctrine of promissory estoppel, therefore, and to the extent that Clark's promise is binding on Fagan, he is precluded from asserting that the same is unenforceable with respect to deliveries made in reliance thereon. Wheeler v. White, Tex.Sup., 398 S.W.2d 93; Restatement of Contracts § 90, § 178 and Comment *f*. This disposes of all questions brought here for review.

The judgments of the courts below are reversed, and the cause is remanded to the district court for a new trial.

REAVLEY and McGEE, JJ., not sitting.