**ASSOCIATED TABULATING SERVICES, INC., Plaintiff-Appellee,**

v.

**OLYMPIC LIFE INSURANCE COMPANY, Defendant-Appellant.**

No. 26949.

United States Court of Appeals
Fifth Circuit.
Aug. 14, 1969.
Rehearing Denied Sept. 9, 1969.

Beale Dean, J. Shelby Sharpe, Brown, Herman, Scott, Young & Dean, Paul C. Cook, Cook & Hobbs, Fort Worth, Tex., for appellant.

W. B. West, III, Jack D. Eades, Clark, West, Keller, Clark & Ginsberg, Dallas, Tex., for appellee.

Before COLEMAN and SIMPSON, Circuit Judges, and MEHRTENS, District Judge.

COLEMAN, Circuit Judge:

This diversity action was instituted by Associated Tabulating Services, Inc., of Los Angeles, against Olympic Life Insurance Company, of Fort Worth, to recover damages for breach of contract. In the course of this opinion we shall occasionally refer to Associated as the computer company and to Olympic as the insurance company.

In November, 1963, W. R. Bagg, headed a group, not yet incorporated, known as the "Association for the Incorporation of Olympic Life Insurance Company". At that time Bagg met with the President of Associated to discuss the possibility of the computer company doing certain data processing work for Olympic.

At the time of this first meeting, Associated was engaged in performing data processing services for Empire Life, a California corporation. One of the attractive features of Associated's plan was that it would do Olympic's work without the insurance company being required to pay the initial programming or "set-up" charge which was typical in the industry. This charge could be eliminated, the computer President explained, by amortizing the initial cost over a five year period. Specifically, Associated would charge Olympic a

flat rate of $5 per insurance policy, which was to cover production work and also be the basis for amortizing the initial costs over five years. It was also thought that programming costs could be held to a minimum, since Associated was currently doing the same work for Empire Life.

No specific proposal was made at that time because, as the computer President stated, "we did not know the extent of the work activity that we would be asked to perform". Discussion of amortization costs was limited to the initial meeting in November, 1963.

In January, 1964, the computer company sent Tim Brault, head of its data processing division, to confer with Olympic's President and Vice-President about Olympic's data processing plans. Apparently, no final plans were made. In fact, the computer President admitted that these meetings were introductory in character and bound neither party.

Correspondence between Associated and Olympic followed. On January 28, 1964, Olympic wrote the Associated Vice-President that it was good to see him during his visit to Fort Worth "so we could begin considering your proposed servicing arrangements for our company". Olympic expressed regret that the computer President had not been able to come to Fort Worth, but stated: "While his absence will necessitate further discussion on the actual fees and other general matters, I assume that these can be negotiated on a mutually satisfactory basis and am proceeding at this time on that assumption". This letter of January 28, 1964, concluded:

"As soon as I receive a reply to this letter and have a chance to go over the entire project with Clarence Carlson, I believe Olympic will be in a position to negotiate a definite arrangement with you. We will, of course, want our final arrangement to be contractual, so if you can send me either a copy of your agreement with Empire or a preliminary copy of the proposed agreement with Olympic, I can be reviewing this also."

Obviously, as of this date, there had been nothing more than preliminary discussions between the parties. There was definitely no contract, and the request for a copy of Associated's contract with Empire or a copy of the proposed agreement with Olympic was never fulfilled.

On February 5, 1964, the computer company responded to Olympic, answering the inquiries previously propounded and explaining the procedures which would be used by Associated in its work for Olympic. In conclusion, Associated promised that upon return of its President to his office "the preparation of a proposed agreement between Fund Administrative Associates [parent company of Associated] and Olympic Life Insurance Company will be completed and forwarded to you in the very near future".

On February 24, 1964, Associated submitted "our proposal for tabulating services for Olympic Life Insurance Company". Associated suggested that Olympic "review this proposal and attached list of services and then, after we are certain that we have included all the services you desire, we will prepare a written contract which will list in complete detail all the services we are to perform". Under this proposal programming would be concentrated in five areas: (1) policy worksheet; (2) monthly reports; (3) premium billing; (4) monthly accounting reports; and (5) actuarial reports.

In this February 24 letter, Associated discussed the $5 per policy fee which had been introduced into the negotiations earlier. However, no mention was made of the proposed amortization over a five year period. The letter concluded:

"I trust the above proposal meets with your approval. We are, of course, prepared to start work immediately upon your direction and receipt of the necessary forms, etc., that

you are having printed specially for this work."

The critically important aspect of this communication, in the light of later developments, is that the computer company did not say that it was agreeing to do the work for five years or for any other specified period, nor did it say that it expected to do so.

In a subsequent letter, dated March 25, 1964, the computer company submitted revised quotations at reduced prices on part of the work to be done, again specifying no time for which the quotations were to hold but expressing the hope that they could begin work in the near future.

All of this occurred before Olympic was incorporated, which did not take place until April 22, 1964. Olympic did not begin selling insurance until June 1. Sometime after April 22 it did forward to the computer company the specified forms for data processing the insurance policies intended to be issued.

It is undisputed that Associated's data processing work for Olympic commenced June 1, 1964, and continued only until July 16, at which time it was terminated by Olympic because it considered the work unsatisfactory. Associated returned the blank data processing forms which had been sent to it by Olympic.

Thereafter, Associated instituted suit in the United States District Court for the Northern District of Texas, asserting that the parties had entered into a five year contract for Associated to perform data processing work and that Olympic, by its July 16 termination, wrongfully breached the contract. The contract was formed, Associated asserted, through the series of written correspondence and telephone conversations between Associated and Olympic from December, 1963 until June, 1964. Associated additionally contended that Olympic was promissorily estopped from denying the existence of the contract or breach thereof.

This recites the facts in the light most favorable to the computer company, since it won the jury verdict.

Associated originally sought recovery on a quantum meruit theory but abandoned it when the defendant's motion for a directed verdict was overruled and the case submitted to the jury.

Olympic raised four defenses:

(1) The parties never entered into a contract.

(2) If there was a contract, it was terminable at will and not for a period of five years.

(3) If a five year contract did exist, it was unenforceable under the statute of frauds.

(4) Because of the statute of frauds defense, Associated could not properly rely on the doctrine of promissory estoppel.

In response to special issues propounded by the Court, the jury found (1) that there was a contract between the parties for the performance of data processing for a period of five years; (2) the computer company had so far performed the contract that it would be perpetrating a fraud if the contract were not enforced; (3) that prior to July 16, 1964, the computer company had performed the work contemplated by the contract competently and in a good workmanlike manner; (4) that the computer company had been damaged in the sum of $25,256 as a consequence of the termination of the contract; (5) that the insurance company by its words and conduct made promises or assurances to the computer company which led it reasonably to believe that it had a five year contract for the data processing of its records; and (6) relying on such belief the computer company had rendered services to the insurance company for which $21,756 would constitute reasonable compensation.

Motions for judgment notwithstanding the verdict and for a new trial were denied. Judgment was entered for Associated in the amount of $25,256 (for

breach of contract) plus interest and costs. This appeal followed.

As is now no doubt clearly apparent to the parties, they would have been better off if they had not sent the insurance forms or done the data processing prior to the execution of a written contract. Their omission of this important detail now presents this Court with a mare's nest of legal issues, in some respects self-conflicting, which must be resolved agreeably to Texas law. We find it unnecessary to discuss all of the contentions and counter-contentions of the parties with reference to this factual-legal jumble. Failure to discuss any one of them indicates not that it went unconsidered but rather that it is irrelevant to an appropriate disposition of the appeal.

Is the verdict that there was a five year contract supported by substantial evidence? We must answer in the negative.

Obviously, it is impossible that there could have been a contract of any kind prior to February 24, 1964. Events before that date amounted to nothing more than exploratory discussions of an anticipated contractual relationship. Nothing happened but an exchange of information as to what the Olympic promoters expected to do and what the computer company had been doing for other insurance companies and thus could do for Olympic as to data processing services. The computer company President admitted that these meetings and discussions prior to January 28, 1964, were introductory in character and bound neither party.

The letter from Olympic to Associated dated January 28, 1964 specifically stated that "as soon as I receive a reply to this letter (which would include a copy of Associated's contract with Empire or a preliminary copy of its proposed agreement with Olympic) *I believe Olympic will be in a position to negotiate a definite arrangement with you. We will, of course, want our final arrangement to be contractual * * *"*. (Emphasis added).

Associated sent neither the copy of its contract with Empire nor a preliminary copy of its proposed agreement but promised that as soon as the Associated President returned to his office the preparation of a proposed agreement would be completed and forwarded.

This relegates us to a consideration of what happened after February 24, 1964. In the letter of that date, Associated submitted "our proposal for tabulating services for Olympic Life Insurance Company". The letter requested a review of the proposal and the attached list of services and promised that "after we are certain that we have included all the services you desire, *we will prepare a written contract which will list in complete detail all the services we are to perform*". (Again, emphasis added). The inescapable connotation of these communications is that at the time of the correspondence neither party intended, agreed, or expected that there would be a contract until one had been reduced to writing, agreed to, and formally executed. No contract was ever written or executed.

Later, however, the parties did not strictly adhere to this course. They did take steps which partook of a contractual nature; that is, Olympic sent the required forms, Associated did the work, and for a few weeks Olympic accepted the work. Both sides neglected to specify how long this practice was to continue. They no doubt had their respective views on the subject but this record is bare of any actual meeting of the minds. When a record consists altogether of undisputed facts and circumstances, the question is one of law, not fact. See Southwestern States Oil and Gas Company v. Sovereign Resources, Inc., 365 S.W.2d 417 (Tex.Civ.App., 1963); Hegar v. Tucker, 274 S.W.2d 752 (Tex.Civ.App., 1955); 10 Tex.Juris., § 30, p. 54; Premier Oil Refining Company of Texas v. Bates, 367 S.W.2d 904 (Tex.Civ.App., 1963). We are therefore forced to the conclusion that there was no evidence to go to the jury or to sup-

port the verdict that there was, in fact, a contract for five years.

The argument of Olympic that, in any event, the five year term was invalid because of the Texas Statute of Frauds is accordingly irrelevant.

■ Olympic strongly urged below, and insists here, that if there was a contract of any kind it was terminable at the will of either party. The District Court declined to submit this theory to the consideration of the jury. We think this action was correct. The evidence is simply devoid of any rational basis for a belief that the computer company ever contemplated such a contract or agreed to such an arrangement. Quite to the contrary, the evidence shows beyond question that Associated could not have and would not have undertaken the work at five dollars per policy, terminable at will.

This, however, is not the end of the matter.

In response to an interrogatory founded upon the Texas law of promissory estoppel, the jury found from a preponderance of the evidence that by its words and conduct Olympic made promises or assurances to Associated which led it reasonably to believe that it had a five year contract for the data processing; that, acting upon that belief, it performed services of a definite and substantial character; and that $21,756 would reasonably compensate for such services.

On the subject of promissory estoppel the District Judge charged the jury as follows:

"Now, in Count 3, plaintiff in the alternative, seeks to recover from defendant the damages which it alleges it suffered as a result of its reliance on the acts and conduct of defendant's agents, servants and employees. To this we apply a short description which I will say to you is one of promissory estoppel.

"If you find from a preponderance of the evidence that the defendant, by the words and conduct of its agents, servants and employees, made a promise or assurance to the plaintiff which it should reasonably expect to induce action of a definite and substantial character on the part of the plaintiff, and which did induce such action, then the plaintiff is entitled to recover damages measured by the detriment which is sustained. Such damages are intended to put the plaintiff in the position it would have been in had it not relied on the actions and conduct of the defendant, by compensating plaintiff for its foreseeable, definite and substantial reliance. Damages under plaintiff's alternative plea of estoppel do not, however, include, nor will you allow, damages based upon loss of anticipated profits, or expenses incurred in solicitation of the contract, or those not reasonably in the contemplation of both parties.

"The vital principal is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted."

■■ We are of the opinion that the charge correctly stated the Texas law of promissory estoppel. See Wheeler v. White, 398 S.W.2d 93 (Tex., 1965) and Cooper Petroleum Company v. LaGloria Oil and Gas Company, 436 S.W.2d 889 (Tex., 1969). The verdict of the jury finding Olympic liable in this respect is supported by substantial evidence.

■ We are of the further opinion, however, that the interests of justice require that the amount of just compensation should be submitted to another jury, Title 28, § 2106, U.S.C.A. It is impossible to tell from this record how much, if any, the proof of damages for breach of contract influenced the size of the award for just compensation. It clearly appears that the influence was not inconsiderable. The verdict for just compensation was only $3,770 less than the award for the supposed breach of contract, although the latter would have

included the loss of anticipated profits for five years, which Associated fixed at $98,370. Another jury, with its attention concentrated upon the one issue properly before it, free of irrelevant proof which consciously or unconsciously could distort the verdict, should decide the matter.

The costs of this appeal will be equally apportioned between the parties.

Affirmed in part, and in part reversed and remanded for further proceedings consistent herewith.