Capital Knitting Mills, Inc., Respondent, v Duofold, Inc., Appellant.

First Department, October 20, 1987

### APPEARANCES OF COUNSEL

*Stephen Brodsky* of counsel *(Ruback & Merson, P. C.,* attorneys), for respondent.

*Jack Hassid* of counsel *(Hahn & Hessen,* attorneys), for appellant.

### OPINION OF THE COURT

SANDLER, J.

The defendant, Duofold, Inc., appeals from an order of the I.A. Court denying its motion for summary judgment dismissing the first cause of action of plaintiff, Capital Knitting Mills, Inc., on the ground that the action is void as based on an oral promise "to answer for the debt, default or miscarriage of another person" (General Obligations Law § 5-701 [a] [2]), and further appeals from the court's denial of its motion to dismiss the second cause of action seeking to recover on the basis of unjust enrichment.

The facts adduced on behalf of Capital, which must be assumed to be true on this appeal from a denial of a motion for summary judgment, disclosed the following relevant events. In late 1983, Duofold, a manufacturer and seller of underwear, undertook to develop a new line of products for which it required a special fabric. After discussions with several fabric suppliers, including Capital, Duofold ordered from Capital a certain quantity of the fabric in various striped colored patterns. In reliance upon this order, Capital undertook to acquire from its suppliers the yarns that it would require to manufacture the ordered fabric.

After the initial order was received on December 22, 1983, and after the yarn was ordered, Russell Pitman, a merchandise manager for Duofold involved in the merchandising and manufacture of the products, informed Capital that the ordered fabrics were to be shipped to Holtz and Company, which

was going to manufacture the goods for Duofold, and that Capital would receive a purchase order from Holtz which would include the fabrics previously ordered by Duofold. Pitman was informed that Capital could not proceed until it had checked Holtz's credit with its insurance company, London Guaranty.

In a communication dated February 15, 1984, London Guaranty informed Capital that its last financial statement for Holtz was dated in 1982 and was insufficient to serve as a basis for a credit approval. In addition, London Guaranty advised that all of Holtz's financing at that time was secured, that its condition was unbalanced, and that the company's trend was down. Capital undertook to secure from Holtz an updated financial statement, but although a new statement was promised, none was ever received. Capital then informed Pitman that under the circumstances it could not sell the fabric to Holtz, and Pitman advised that they were "not to be concerned because Duofold was the responsible party."

On the basis of this assurance, Capital undertook to proceed with the production in accordance with a telephone order from Holtz dated February 6, 1984, and a confirmatory purchase order from Holtz dated February 9, 1984, which orders included the original fabrics ordered by Duofold with certain modifications in color patterns that had been agreed on. Upon receipt of Holtz's purchase order, Capital's executive wrote on it the words "1982 financial statement", referring to the absence as of that date of an updated credit reference from London Guaranty. Some two weeks later London Guaranty advised that they had approved credit for Holtz limited to $20,000.

On or about March 15, 1984, Capital informed Holtz that Capital could not accept the purchase order in the light of the poor credit rating. In a following telephone conversation with Pitman describing the situation, "Pitman reiterated his promise that Duofold was the responsible party." At about the same time, Duofold paid Capital with respect to the fabrics covered in its original order and which thereafter had been included in the subsequent order from Holtz, although none of the fabric covered by that payment had been shipped to Duofold, all having been shipped to Holtz in accordance with Duofold's request. Capital further asserts that Duofold continued to supervise and control every aspect of the transaction, reserving the right to alter production schedules, retaining responsibility for changes in the garment specifications, and

retaining the right to alter the quantities of merchandise to be produced.

On or about March 26, 1984, Duofold requested a reduction in the quantities of the fabric to be supplied by Capital and the garments to be manufactured by Holtz. Thereafter, Pitman assured Capital, in response to their expression of concern lest they be stuck with excess goods, that Capital need not be concerned because Duofold was responsible for all the yarn and fabric to be supplied by Capital. This assurance is alleged to have been confirmed by a letter to Holtz in which an executive of Duofold stated that Duofold would accept responsibility for yarn or fabric inventories in excess of its revised requirements.

By the end of April 1984, Holtz had fallen behind in the payments for which it had been invoiced by Capital. As a result, a Capital executive proposed to Duofold that Duofold pay directly for all the goods, with Holtz to continue doing the cutting and sewing. In an affidavit submitted by Capital's sales manager, he asserts that in a telephone conversation in June 1984 Pitman agreed that Duofold would pay Capital directly for all the goods covered by Holtz's purchase order subject to the agreement of Holtz, and that in a separate conversation Capital was informed that Holtz agreed to this arrangement. Allegedly pursuant to these conversations, Capital sent a letter to Mr. Pitman on June 7, 1984, enclosing all invoices previously billed to Holtz and Company, and stating Capital's understanding that Duofold had agreed to pay Capital directly for the piece goods and trimming, and to deduct the cost from Holtz and Company bills. No affirmative response to this letter was received, and no payment from Duofold was forthcoming.

Thereafter, on or about June 25, 1984, Capital was informed that Holtz had filed a petition in bankruptcy on June 14, 1984. After various conversations between Capital and Holtz, and Capital having received no payment, Capital on August 24, 1984 sent Duofold an invoice for the value of the fabrics then remaining at Capital. This action seeks the recovery of the amount set forth in that invoice as well as the invoices sent to Duofold together with a letter on June 7, 1984, which had previously been billed to Holtz.

In denying Duofold's motion for summary judgment, the I.A. Court treated the motion as primarily based on that provision of the Statute of Frauds set forth in UCC 2-201 (1),

which provides that a contract for the sale of goods valued in excess of $500 must be in writing. The court concluded that factual issues were presented as to whether or not the action falls within the exception to that provision of the Statute of Frauds set forth in UCC 2-201 (3) (a), which applies to specially manufactured goods which are not suitable for sale to others in the ordinary course of the seller's business. The court did not directly address the issue primarily presented on this appeal, which is whether or not the first cause of action is void as based on an oral promise "to answer for the debt, default or miscarriage of another person".

■ Preliminarily, we are in agreement with defendant that the record fails to sustain plaintiff's second cause of action based upon the theory of unjust enrichment. Whatever may be Duofold's responsibility for the fabric shipped to Holtz and manufactured but not yet shipped to Holtz, Duofold, having fully paid Holtz for the manufactured goods delivered by Holtz to it, cannot fairly be said to have been unjustly enriched.

Turning to the defendant's claim that the first cause of action is barred as based on an oral promise to answer for the debt, default or miscarriage of another, which presents the principal issue on this appeal, two legally relevant facts clearly appear from the sequence of events described above. First, it is obvious that the main purpose of Duofold in making its alleged promise to be responsible for the payment of the fabric shipped to Holtz was to secure an economic advantage or benefit for itself, and that it was not intended to benefit Holtz. The second significant fact is that, notwithstanding Duofold's promise to be responsible, Capital understood, as evidenced by its acceptance of the order from Holtz and its submission of invoices to Holtz, that Holtz was, at least in the first instance, the party from whom payment was to be secured.

Under what has been varyingly called the "main purpose" or "leading object" rule, almost universally accepted in this country but not the rule in New York, the oral promise attributed to Duofold would not be barred by the Statute of Frauds as a promise to pay for the debt, default or miscarriage of another. As set forth in the Restatement (Second) of Contracts § 116, the main purpose rule provides: "A contract that all or part of a duty of a third person to the promisee shall be satisfied is not within the Statute of Frauds as a promise to answer for the duty of another if the consideration for the promise is in fact or apparently desired by the promi-

sor mainly for his own economic advantage, rather than in order to benefit the third person."

The reason for this rule as set forth in comment a to section 116 is: "Where the surety-promisor's main purpose is his own pecuniary or business advantage, the gratuitous or sentimental element often present in suretyship is eliminated, the likelihood of disproportion in the values exchanged between promisor and promisee is reduced, and the commercial context commonly provides evidentiary safeguards. Thus there is less need for cautionary or evidentiary formality than in other cases of suretyship."

In his exhaustive and searching study of the main purpose or "leading object" rule, Professor Corbin, one of this country's foremost authorities on the law of contracts, strongly supported the rule in the following words: "The 'leading object' rule in its various forms has been subjected to more or less criticism. The best answer to this criticism is to be found in the vast number of cases in which it has been applied. It involves difficult questions of fact; but nevertheless it is believed that this rule has a sound logical and practical basis. There is a difference between cases where the promisor makes his promise for the benefit and accommodation of another and cases where he makes it for his own benefit and concern. In the former cases he is a surety, having to some degree a fiduciary relation with the third person; in the latter cases he is a stranger to the third person and does not belong to the class deserving the protection of the statute." (2 Corbin, Contracts § 366, at 276-277 [1950].)

That the Statute of Frauds would not bar plaintiff's action under the main purpose rule seems free from any substantial doubt. It is indisputably clear that the transactions with which we are concerned were initiated by Duofold for the purpose of securing a line of goods that it intended to sell, that the several promises of Duofold to be responsible for the payment of fabrics manufactured and sold by Capital to Holtz were intended exclusively to secure Duofold's own economic advantage, and that Duofold had no interest whatever in benefiting Holtz.

However, as we have been recently reminded by the Court of Appeals, albeit in a case in which the court found that the plaintiff could not have recovered even under the main purpose rule, "[t]he rule is not recognized in this state" *(Martin Roofing v Goldstein,* 60 NY2d 262, 269). The New

York rule, as restated in *Martin,* provides (at 265): "When a party promises to answer for the debt of another * * * the promise, if it is to be enforceable under the statute, must either be evidenced by writing or plaintiff must prove it is supported by a new consideration moving to the promisor and beneficial to him and that the promisor has become in the intention of the parties a principal debtor primarily liable *(White v Rintoul,* 108 NY 222, 227; and see *Bulkley v Shaw,* 289 NY 133; *Witschard v Brody & Sons,* 257 NY 97, *supra; Richardson Press v Albright,* 224 NY 497)." In view of the undisputed fact that Capital over a period of months invoiced Holtz and did not look to Duofold for payment until after Holtz's unpaid obligations had mounted, it cannot reasonably be said that Duofold had become "in the intention of the parties a principal debtor primarily liable".

We have considered whether or not the oral promise attributed to Duofold in a telephone conversation in June 1984 to pay for the fabrics embraced in the Holtz order so altered the situation as to constitute Duofold as of that time "a principal debtor primarily liable". However, the record discloses no claim by Capital that it acted in reliance on this promise either by way of shipping fabrics to Holtz or, indeed, manufacturing any additional fabrics. In the absence of any claim that Capital relied on the new oral promise attributed to Duofold, and in the absence of any indication that the new promise was intended to extinguish Holtz's liability, we are not persuaded that this promise altered the legal situation or justifies denial of Duofold's motion for summary judgment.

Because the facts would present so compelling a case for recovery under the rule accepted almost universally in this country, and because the very careful discussion of the question in *Martin Roofing v Goldstein (supra)* suggests as a possibility that the Court of Appeals might be disposed to reconsider in a case squarely presenting the issue what has been described as "the peculiar New York rule" (Calamari and Perillo, Contracts, § 19-8 [3d ed]), we think it appropriate to set forth a brief analysis of the legal evolution that resulted in a rejection in this State of the main purpose rule.

It would unduly extend this opinion to analyze in detail the many Nineteenth Century decisions of the Court of Appeals relevant to an understanding of the development of the New York rule in this area. The most striking fact that emerges from a study of these, and later, decisions, is that in none of the four opinions that collectively came to be interpreted as

establishing the New York rule does there appear an explicit rejection of the main purpose rule. *(See, White v Rintoul,* 108 NY 222; *Richardson Press v Albright,* 224 NY 497; *Witschard v Brody & Sons,* 257 NY 97; *Bulkley v Shaw,* 289 NY 133.) Nor do any of these decisions set forth a reasoned explanation for departing from a doctrine that was already supported by impressive judicial authority. *(See, Nelson v Boynton,* 3 Metc [44 Mass] 396, 400 [1841]; *Emerson v Slater,* 22 How [63 US] 28 [1859].)

In *White v Rintoul (supra)* the only 1 of the 4 opinions to refer directly to the main purpose rule, and whose formulation of the New York rule came to be considered as a rejection of that rule, the Court of Appeals concluded after a detailed analysis of the facts that the primary motivation of the promisor was to assist his son, a member of the debtor firm. It is also of some interest that in *Witschard v Brody & Sons (supra)* the first, and arguably only Court of Appeals decision after *White v Rintoul* in which the result would have been different if the main purpose rule had been followed, the Court of Appeals did not refer to the opinion in *White v Rintoul,* but rather cited as support for its determination *Mallory v Gillett* (21 NY 412) and *Richardson Press v Albright (supra).* But in *Mallory,* the Court of Appeals had cited with approval the famous statement of the main purpose rule by Chief Judge Shaw of Massachusetts in *Nelson v Boynton (supra),* perhaps the most influential single judicial comment in this area. And although *Richardson Press v Albright (supra)* may reasonably be interpreted as disclosing an intent to depart from the main purpose rule, the Court of Appeals did not express that intent explicitly, and in fact referred to the interest of the promisor in that case as "remote" (at 501).

It of course does not follow that the New York rule is wrong or untenable simply because it is today almost unique, if not in fact unique, in its approach to the problem presented where the primary purpose of a promisor is to secure a benefit for itself. Nor does such a conclusion inexorably follow from the circumstance that the New York rule was developed in a group of cases that never squarely confronted the opposing rule, now almost universally accepted, and that presented no reasoned statement for rejecting that rule. But the uncomfortable reality remains that the overwhelming weight of authority has come to accept the main purpose rule as sound, that it is generally approved by contemporary scholars, and that New York is almost alone, if not in fact alone, in rejecting it.

It is also of some interest that Texas, the only other State called to our attention which was believed to have rejected the main purpose rule, has more recently come to accept that rule, relying on the analysis set forth by Corbin, and the adoption of the rule in the Restatement of Contracts. *(Cooper Petroleum Co. v LaGloria Oil & Gas Co.,* 436 SW2d 889.)

As observed earlier in this opinion, the Court of Appeals noted recently in *Martin Roofing v Goldstein* (60 NY2d 262, *supra)* that the main purpose rule was not the law in this State. However, that statement was made in an opinion in which the court concluded that the main purpose rule would, in any event, have been inapplicable, and has the appearance of a comment meant to describe the existing state of the law in a case in which the facts did not require the Court of Appeals to reevaluate its soundness, and not as an affirmation of the correctness and continuing validity of the rule. Although it would be inappropriate to read too much into the very careful discussion of the question in *Martin Roofing,* it does not seem unreasonable to conclude from that discussion that the Court of Appeals might well be receptive to reconsidering that rule in a case in which the facts make such reconsideration legally significant.

However, this court is, of course, bound by the law of this State as it is, and not by the rule generally accepted elsewhere. The presently controlling rule seems to us to require that plaintiff's first cause of action be dismissed as based on an oral promise to answer for the debt, default or miscarriage of another.

Accordingly, the order of the Supreme Court, New York County (Wilk, J.), entered October 24, 1986, denying defendant's motion to dismiss the first cause of action of the complaint as barred by the Statute of Frauds and denying the motion to dismiss the second cause of action based on unjust enrichment should be reversed, on the law, without costs, and the motion for summary judgment dismissing the complaint should be granted.

MURPHY, P. J., SULLIVAN, ROSENBERGER and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on October 24, 1986, unanimously reversed, on the law, without costs and without disbursements, and the motion for summary judgment dismissing the complaint granted.