**HANSON SOUTHWEST CORPORATION and Hanson Development Company, Appellants,**

v.

**DAL–MAC CONSTRUCTION COMPANY, Appellee.**

No. 19008.

Court of Civil Appeals of Texas, Dallas.

March 30, 1977.

Rehearing Denied July 6, 1977.

Joel Held, Simon, Twombly & Held, L. Vance Stanton, Strother, Davis, Stanton & Levy, Dallas, for appellants.

Robert H. Thomas, Strasburger & Price, Dallas, for appellee.

AKIN, Justice.

Hanson Southwest Corporation and Hanson Development Company appeal from an adverse judgment rendered in favor of Dal-Mac Construction Company for damages allegedly arising from the breach of a construction contract. The contract was between Dal-Mac and Hanson Southwest for the construction of a shopping center known as Masters Village. Dal-Mac worked on the center for approximately two and one-half months, but stopped because it had not been paid. Dal-Mac then sued Hanson Southwest on the contract and its parent corporation, Hanson Development, on an alter-ego theory. Acting on a jury verdict, the trial court rendered judgment against both defendants jointly and severally for $422,504.36, plus $87,500.00 in attorneys' fees. Both defendants appeal. Because we hold that the jury findings and the evidence fail to support a judgment against the parent corporation, we reverse and render with respect to Hanson Development. Because we also hold that attorneys' fees are not recoverable on the contract, we likewise reverse and render with respect to the recovery of attorneys' fees allowed by the trial court. With respect to the claim of Dal-Mac against Hanson Southwest, we reverse and remand for a new trial because the damages awarded are unsupported by evidence.

### Alter Ego

Dal-Mac asserts, and the jury found, that Hanson Southwest was the alter ego of Hanson Development and, therefore, liable to it in damages resulting from Dal-Mac's contract with Hanson Southwest. To support the findings with respect to alter ego, Dal-Mac relies on Hanson Development's guaranty of the purchase-money loan for the site, Hanson Development's control of the flow of funds to Hanson Southwest, Hanson Development's ownership of all of the stock of Hanson Southwest, and representations made to third parties that Masters Village was owned by Hanson Development or by the "Hanson Companies" (an umbrella term used to refer to a number of related companies, although no legal entity by that name exists). We cannot agree that these factors, even if established, make Hanson Southwest the alter ego of Hanson Development. There must be some ground in addition to mere unity of financial interest, ownership, and control for a court to treat them as one in law and make each responsible for the torts and contracts of the other. That additional ground turns on whether there was good faith and honesty in the use of a subsidiary corporate entity for legitimate ends. Generally, it is determined by whether the subsidiary corporate entity is so controlled and manipulated by the parent for the parent's own interests that it prejudices innocent third parties or is in contravention of the public welfare. *See State v. Swift & Co.*, 187 S.W.2d 127, 133–34 (Tex.Civ.App.—Austin 1945, writ ref'd); Pelletier, *Corporations, Annual Survey of Texas Law*, 21 S.W. L.J. 134, 141–42 (1967); Ballantine, *Parent and Subsidiary Corporations*, 14 Cal.L.Rev. 12, 19 (1926). The general rule is that courts will not disregard separate legal entities because of identity of ownership, directors and officers unless the purpose of the relationship is to defeat public conve-

nience, protect fraud, defend crime, or justify wrongs, such as violation of anti-trust laws. *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336, 339 (Tex.1968).

■ Much confusion exists in determining the criteria for disregarding the corporate entity. This confusion exists partially because of the words used to describe the condition. Courts have used such terms as "dummy," "sham," "instrumentality," "agency," "adjunct," "tool," "device," and "business conduit," to name a few. What these words mean relative to the fact situation of the case is elusive. As Mr. Justice Cardozo, then Associate Judge of the New York Court of Appeals, observed in *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 155 N.E. 58, 61 (1926):

> The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. *Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it.* We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an "alias" or a "dummy." All of this is well enough if the picturesqueness of the epithets does not lead us to forget that *the essential term to be defined is the act of operation.* Dominion may be so complete, interference so obstrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice. Ballantine, *Parent and Subsidiary Corporations*, 14 Cal.L.Rev. 12, 18, 19, 20. The logical consistency of a juridical conception will indeed be sacrificed at times, when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking where the attempted separation between parent and subsidiary will work a fraud upon the law . . . . . At such times unity is ascribed to parts which, at least for many pur-

poses, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form. [emphasis added]

The problem as delineated by Justice Cardozo is as troublesome today as then because of the metaphors used by our courts to describe the act or acts necessary to trigger the application of alter ego. Courts have generally been less reluctant to disregard the corporate entity in tort cases than in cases of contract because the injured party in contract cases had the opportunity to select the entity with whom he contracted; in a tort case, no such selection is made by a plaintiff. *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex.1975). Because Dal-Mac's contract with the subsidiary, Hanson Southwest, is the basis of the claim against the parent, Hanson Development, our further consideration of the alter-ego doctrine will be limited to the more stringent standards applied to contracts. In *Bell Oil & Gas Co.*, at 340, Justice Norvell quoted from Douglas and Shanks, *Insulation from Liability Through Subsidiary Corporation*, 39 Yale L.J. 193, 210–11 (1929), the following:

> The attempt to hold a parent corporation where the claim asserted is of contractual origin presents added difficulties. The very reasonable question must be met and answered why one contracted with the subsidiary and received the promise which he bargained for but who has been disappointed in the fulfillment by the subsidiary of its commitment should then be allowed to look to the parent. As a matter of contract right it is evident he may not. Additional compelling facts must appear.

Justice Norvell also observed that it is difficult, if not impossible, to put these "additional compelling facts" in the form of a "laundry list." *Bell Oil & Gas Co.* at 340: *see* 1 Hildebrand, *Texas Corporations* § 5 at 43 (1942). Generally, courts find these "additional compelling facts" in cases where the plaintiff has acted to his detriment upon representations made by officers of the parent corporation concerning control

and ownership of the subsidiary and the payment of its debts. *See* 39 Yale L.J. at 211.

Since Dal-Mac cannot hold Hanson Development on its contract with Hanson Southwest merely because it owns and controls the subsidiary, we must review the evidence to ascertain if additional compelling facts exist so as to justify ignoring the corporate entity of Hanson Southwest and to hold Hanson Development liable. Virtually all of the negotiations leading to the contract were between Dal-Mac's chief executive officer, Herbert McJunkin, and Hanson Southwest's Vice President, John Notestine. Notestine originally introduced himself as being with the "Hanson Companies." Notestine was, in fact, an officer of Hanson Southwest only. Notestine also furnished McJunkin with copies of "Topics," a publication of the "Hanson Companies" directed to potential shopping-center tenants. This publication listed centers as being operated by the "Hanson Companies" regardless of which of several related corporations actually owned the center. McJunkin testified that, prior to execution of the contract, he attempted to obtain a credit report on Hanson Southwest through his bank, but was told that no reports were available. Fearing that Hanson Southwest might be a "shell" corporation, he requested that the contract be guarantied by the Hanson brothers personally or by Hanson Development, but he never received a guaranty. McJunkin admitted that he was told that he would not receive a personal guaranty from the Hanson brothers prior to execution of the contract on May 30, but was uncertain whether he was told that he would not receive a Hanson Development guaranty. At a meeting with Notestine on June 25, McJunkin was told that a "financial assurance" (either a Hanson Development guaranty or a copy of a loan commitment) was in the mail. Despite never receiving this assurance, Dal-Mac continued construction until August 12.

Under these facts, Dal-Mac has not answered Professor Shank's question of why the claimant who contracted with the subsidiary and is disappointed should be permitted recovery from the parent. Dal-Mac entered into the contract with Hanson Southwest realizing that it might not be financially sound and despite fruitless efforts to obtain a guaranty from the parent company. Although efforts to secure Dal-Mac's position failed, Dal-Mac relies upon Notestine's representation of June 25 that a "financial assurance" was in the mail. Since Notestine was not an officer of Hanson Development, this representation, even if false when made, is of no avail to Dal-Mac in its attempt to hold Hanson Development liable on the contract. Furthermore, this representation that "financial assurance was in the mail" is not tantamount to a representation that Hanson Development would be financially responsible for the project since a loan commitment would have been a financial assurance which would not have obligated Hanson Development. Finally, this representation was made after Dal-Mac had entered into the contract and had begun performance. Consequently, this is not an "additional compelling fact" justifying imposition of liability on Hanson Development.

The authorities referred to above establish that courts will not disregard a corporate entity unless it is employed to defraud existing creditors of the shareholder, to evade an existing obligation, to circumvent a statute, to achieve or perpetuate a monopoly or to protect crimes. None of these extraordinary situations exists here to justify disregarding Hanson Southwest's separate corporate entity. We reverse, therefore, the judgment of the trial court with respect to Hanson Development and render judgment that Dal-Mac recover nothing from Hanson Development.

### Agency Theory

Although the agency theory was pleaded as a part of alter ego, and apparently submitted as such, Dal-Mac now argues that Hanson Development's liability on the contract is established because the jury found that Hanson Southwest was the agent of Hanson Development in its dealings with Dal-Mac. We cannot agree. The

evidence here is insufficient to support a true principal-agent relationship so as to hold Hanson Development liable on the contract of its subsidiary. The general rule is that one who deals with an agent has the burden of proving the authority of the agent. *Buchoz v. Klein*, 143 Tex. 284, 184 S.W.2d 271 (1944). The power of a corporate agent to bind the corporation depends upon the authority conferred by the bylaws, charter, and resolutions of the directors, as well as the general rules governing the relation of principal and agent. This relationship may be established by the express authority of the principal or by implied authority. Since there is no evidence here to show any express authority of Hanson Southwest to act as the agent for Hanson Development, the question then turns on whether Hanson Development impliedly granted Hanson Southwest authority. To determine this we must again look to the facts. Prior to contracting with Hanson Southwest, Dal-Mac knew that it was one of the "Hanson Companies," but also knew that it was not Hanson Development. Dal-Mac was also aware that Hanson Development had a substantial net worth, but that no financial report on Hanson Southwest was available. Prior to contracting, Dal-Mac attempted to obtain a guaranty from Hanson Development without success. Nevertheless, it proceeded to contract with Hanson Southwest alone. Under these facts, the law will not imply a principal-agent relationship for the purpose of binding the parent because there was no evidence tending to show that Hanson Development consented to Hanson Southwest's acting as its agent in signing the contract. Indeed, the evidence is to the contrary. Nor is this a situation in which the subsidiary was cloaked with the apparent authority of the parent since Dal-Mac was obviously aware that Hanson Southwest was acting on its own behalf.

*Contractual Liability of Hanson Southwest*

After commencing work, Dal-Mac submitted four "draw requests" to Notestine for payment for work performed and materials supplied during construction, but never received payment from Hanson Southwest. Hanson Southwest now asserts numerous grounds as to why the contract should not be enforced against it. Most of these grounds assert that Dal-Mac has failed to comply with conditions precedent set forth in the contract.

Hanson Southwest first contends that payment of the monthly draw requests was conditioned upon approval by an inspecting architect and that since an architect's approval was never obtained by Dal-Mac, Dal-Mac is not entitled to payment pursuant to the contract. On the other hand, Dal-Mac argues that approval by an inspecting architect was necessary only if Hanson Southwest obtained financing through a lender who required approval by an architect. The contract provides:

4. The Contractor shall . . .

(b) Provide the on-site inspections of a licensed architect acceptable to the Owner and the mortgage lenders for the purpose of examination of the progress of the work and its adherence to the contract documents and for the certification of trade breakdowns *if required by the construction and/or permanent lender.*

. . . . .

6. The Contractor shall submit monthly statements to the Owner for work performed and in place at the site as of the 25th day of each month, setting forth in detail the various percentages of completion of the work. Within twenty (20) days after its receipt of each monthly statement, the Owner shall pay directly to the Contractor the appropriate amounts for which request for payment is made therein, less 10% to be retained by the Owner until final settlement. *Upon substantial completion, retainage to be reduced to 5% of the contract amount.*

*Said progress payments shall be made to the Contractor in accordance with certificates of approval by the architect and the lending institution from which construction funds are to be obtained.* The Contractor agrees to be bound by and accept the reasonable estimate of said

architect as to the quantity and quality of the work performed.

In the event the Owner wishes to object to the reasonableness of the payment of work approved by the architect, it shall do so in writing within 96 hours of receipt of the architect's certificate. Owner may then withhold from regular progress payments an amount equal to the difference between the value as established by the architect and the value as established by Owner. The dispute shall then be submitted to arbitration, . . . for final determination and the Contractor shall continue with the work during arbitration. [emphasis added]

The "General Notes," attached to and made a part of the contract, provide:

*Construction Cost Breakdown:*

.     .     .     .     .

Allowance for Architectural Supervision, if required                    $10,853

.     .     .     .     .

*Variations to Drawings & Specifications:*

.     .     .     .     .

4. No additional architectural or engineering fee included *except allowance for supervision of construction if required by mortgage lender.* [emphasis added]

■ An elementary rule of contract construction requires us to construe the entire contract in such a manner that the various provisions are harmonious, not repugnant, if possible. *Myers v. Gulf Coast Minerals Management Corp.,* 361 S.W.2d 193, 197 (Tex.1962). The construction cost breakdown contained in the "General Notes" consists of four categories: general construction (including buildings and bond premium), sprinkler systems, architectural supervision allowance and utilities construction. The sole reference to funds allocated for architectural supervision or inspection is expressly conditioned upon this inspection being required by some party. The notation under "Variations" clarifies that it is the mortgage lender who can require architectural supervision. Thus, as we read the contract, approval of the draw requests by an inspecting architect is necessary only if

Hanson Southwest obtained financing through a lender and the lender required an architect's approval. Absent such requirement, submission of the draw requests for payment and any objection by the owner to the amounts would be governed by other provisions in the contract; approval by an architect or lender would not be necessary. To construe the contract as Hanson Southwest advocates would render the language "if required" meaningless because an architect's inspection would be absolutely required despite the fact that the requirement is referred to in the contract as conditional.

■ The next condition precedent asserted is that a construction loan would be obtained by Hanson Southwest before Dal-Mac would be paid. In support of this contention, Hanson Southwest relies upon two contract provisions:

4. The Contractor shall provide  .     .

(b) .   .   .   the on-site inspections of a licensed architect acceptable to the Owner and the mortgage lenders  .   ..

6. .   .   .   Said progress payments shall be made to the Contractor and the lending institution from which construction funds are to be obtained.

Thus, it is clear that the contract contemplates that a construction loan will be obtained. Whether a clause constitutes a condition precedent, however, must be determined from the contract as a whole and the surrounding circumstances; conditions are not favored, and a clause will be construed as a covenant only if it is reasonably subject to that interpretation. *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976). These clauses are subject to the interpretation that they are references to the anticipated source of funds and are merely designed to set out Dal-Mac's responsibilities to the lender once a loan is obtained. This is especially true in view of Hanson Southwest's instructions to Dal-Mac to secure a building permit and to order critical materials since Dal-Mac's time for completion of the contract began to run as soon as the building permit was obtained.

■ Hanson Southwest next argues that its approval of all major subcontractors and purchase orders, which was not obtained, was likewise a condition precedent. In this respect, they rely upon paragraph eight of the contract, which provides:

Prior to the letting of any major subcontract or the granting of any purchase order, the Contractor will submit the same for Owner's review. . . . Owner may recommend a substitution for any subcontractor or purchase order, which recommendation shall not be binding upon the Contractor.

We fail to see how a provision giving the owner an opportunity to recommend subcontractors can be construed as a condition precedent to payment under the rule stated in *Hohenberg Bros.*, when the contractor is free to disregard any recommendations so made.

■ The last condition precedent asserted is that Dal-Mac was required to furnish a subordination of its mechanic's lien interest with each draw request. The contract provides in paragraph seven:

The Contractor agrees that, simultaneously with any requisition for payment, it will deliver to the Owner a fully executed and acknowledged form, whereby any mechanics lien interest it may have shall be subordinate to the construction mortgage to the extent of the amount of the moneys received.

We need not pass on whether this is a condition or a covenant because no construction mortgage existed. Indeed, the lack of a construction mortgage precipitated this controversy.

■ Hanson Southwest also attacks the jury finding that an officer of Hanson Southwest authorized Dal-Mac to begin construction on the ground that there is insufficient evidence to support it. It concludes, therefore, that Dal-Mac was not entitled to recover because no such authorization to commence was given. We cannot agree. As noted *supra,* Notestine expressly authorized Dal-Mac to order critical materials and to secure the building permit, from which the jury could infer that Dal-Mac was authorized to commence construction since the contract provided that the time for construction started as soon as the building permit was obtained. Additionally, a letter from Notestine to an officer of Hanson Development, dated June 7, states that Notestine had authorized construction to begin. Although this letter was admitted without objection, Hanson Southwest now contends that it is hearsay and is of no probative value. We cannot agree because the letter was written by an officer of Hanson Southwest and is, consequently, admissible as an admission. We conclude, therefore, that this jury finding is amply supported by evidence.

Since we have concluded that Hanson Southwest's attacks are without merit with respect to its liability under the contract with Dal-Mac, Dal-Mac is entitled to recovery on the contract if the damages found by the jury have support in evidence. We turn, therefore, to Hanson's contentions concerning the admissibility of evidence to support the findings on damages.

### Damages

■ The only special issue relating to damages was as follows:

. . . what do you find to be the fair and reasonable cash value, if any, in Dallas, Texas, of the services performed and the labor and materials furnished or ordered by Dal-Mac on the Master Village project?

Answer: $422,504.36.

Hanson objected to the issue on the ground that this measure of damage is one of *quantum meruit* rather than contract. On the other hand, Dal-Mac maintains that although its action is solely grounded in contract, the special issue is phrased in the manner required by paragraph 29 of the contract. We cannot agree with Dal-Mac's contention. That provision provides:

29. . . .

In the event of the termination of the within agreement due to the fault of the Contractor . . ., the Owner may . . . complete the work . . . in

a commercially reasonable manner. . .

In the event that the unpaid balance of the contract price and extras due Contractor exceed the reasonable expenses paid by the Owner, the difference shall . . . be paid by the Owner to the Contractor; if such reasonable expenses paid by the Owner exceed the balance due Contractor, the difference shall . . . be paid by the Contractor to the Owner.

.    .    .    .    .

In the event the Contractor shall terminate the   .  .  .   agreement and declare the same null and void, neither party shall thereafter be under further obligation to the other, *except that the Contractor shall have the right to receive and the Owner shall be obligated to pay all sums due to the Contractor for work previously performed and* materials previously supplied to or ordered for the project. . . . [emphasis added]

It is apparent from the above language that "reasonable value" is a contractual measure of damages only if the contractor breaches the agreement. Where, as here, breach is asserted against the owner, the contract provides that the measure of damages will be "all sums due to the Contractor for work previously performed and materials previously supplied to or ordered for the project." We sustain, therefore, Hanson's point of error with respect to this issue. On retrial, the damage issue should be worded to inquire what amount, if any, Dal-Mac reasonably expended for work performed and materials supplied to or ordered for the Masters Village project prior to the termination of the contract. This sum should be reduced by the value of the unused materials on hand. *See* 5 Corbin, Contracts § 1094, p. 511 (1964).

Hanson also argues that the trial court erred in admitting into evidence plaintiff's exhibit 47, which is the only evidence that would support a judgment in the exact amount found by the jury. Plaintiff's exhibit 47 is a sheet kept by the comptroller of Dal-Mac and updated month-ly. On this sheet, he recorded bills received by Dal-Mac for the Masters Village project. He was able to identify the invoices attributable to a given project by reference to delivery tickets attached to the invoices. This sheet was part of a system maintained by Dal-Mac on each project. Dal-Mac urges that plaintiff's exhibit 47 is a business record and, therefore, is admissible under Tex. Rev.Civ.Stat.Ann. art. 3737e (Vernon Supp. 1976). Before a record is admissible under this article, the trial court must find that:

(a) It was made in the regular course of business;

(b) It was the regular course of *that business* for an *employee or representative* of *such business* with *personal knowledge of such act, event or condition to make such memorandum or record or to transmit information thereof* to be included in such memorandum or record;

(c) It was made at or near the time of the act, event or condition or reasonably soon thereafter. [emphasis added]

The comptroller testified that the record was made in the regular course of business, and it is at least arguable that the monthly record was made "reasonably soon" after the invoices were received. The second requirement, however, presents a problem with respect to this record. The "personal knowledge" of the comptroller who prepared the record is limited to the fact that various subcontractors billed Dal-Mac for the labor and materials; he has no independent knowledge that such services or materials were, in fact, rendered or supplied in connection with this project, and he was not furnished such information by employees of Dal-Mac. We conclude, therefore, that plaintiff's exhibit 47 is not admissible under article 3737e to prove the value of the services rendered and materials expended on the Masters Village project because the underlying invoices supporting the exhibit were not admissible.

Dal-Mac asserts, however, that this evidence is admissible under the authority of *University Savings & Loan Ass'n v. Security Lumber Co.,* 423 S.W.2d 287 (Tex.1967). In that case the supreme court held invoices

of Security Lumber Company to fall within the ambit of article 3737e and, therefore, admissible. However, Security Lumber's president testified to all of the prerequisites set forth in the statute. Dal-Mac is attempting to introduce an exhibit based upon invoices prepared by employees of subcontractors rather than upon invoices prepared by employees of Dal-Mac. Obviously, Dal-Mac's custodian of the records cannot say that invoices of a subcontractor were prepared by an employee of that subcontractor who had personal knowledge of the statements contained in the document or that it was made at the time of the transaction. Consequently, *Security Lumber Company* is not controlling here.

■■■ Neither is exhibit 47 admissible as a summary. The supreme court, in *Black Lake Pipe Line Co. v. Union Construction Co.,* 538 S.W.2d 80 (Tex.1976), established a three-pronged test for the admission of summaries. Before a summary may be admitted, the proponent must show that the records from which it was prepared are voluminous, admissible, and accessible to opposing counsel. *Id.* at 93–94. The determinations of what is "voluminous" and whether opposing counsel has been afforded adequate opportunity to inspect the records are in the discretion of the trial court. *Id.* at 93. Here, the record shows that the invoices produced at trial constituted a one-inch stack. There were other invoices which were not brought to court, but the number of these is unclear. If the trial court believed that the summary was necessary to expedite the trial, we cannot say that it abused its discretion. Counsel for Dal-Mac offered to produce any additional records requested by opposing counsel; no request was made. Likewise, we cannot say that the trial court abused its discretion in determining that opposing counsel had adequate opportunity to inspect the underlying records. The problem is, however, that the admissibility of the underlying records was not established. There is no showing that the invoices were prepared in the usual course of the various subcontractors' business by an employee who had personal knowledge of the facts recited or that the materials and services were supplied in connection with the project in question. The underlying invoices would be, therefore, hearsay and inadmissible to show the materials expended and services rendered on the Masters Village project. *Cooper Petroleum Co. v. LaGloria Oil and Gas Co.,* 436 S.W.2d 889, 891 (Tex.1969). Since hearsay will not support a jury finding, the damages found were not supported by evidence. Consequently, under Tex.R.Civ.P. 434, we must remand the entire cause with respect to Hanson Southwest for a new trial.

*Attorneys' Fees*

■■■ Dal-Mac argues that attorneys' fees are properly recoverable because this is a suit for "services rendered, labor done and materials furnished" under Tex.Rev.Civ. Stat.Ann.· art. 2226 (Vernon Supp.1976). On the other hand, Hanson Southwest contends that any services rendered, labor done and materials furnished were by third parties in the construction of a product, the shopping center, rather than by Dal-Mac for the benefit of Hanson Southwest. We agree with Hanson. The supreme court in *Tenneco Oil Co. v. Padre Drilling Co.,* 453 S.W.2d 814, 820 (Tex.1970) held that a corporation was incapable of rendering "personal services" within this statute; any services a corporation renders would, of necessity, be rendered by its agents or employees. It construed the statute to mean that the person who sought attorneys' fees must have rendered these services himself. The statute was amended, however, in 1971 to delete the word "personal" before "services," thereby enabling corporations to recover for services rendered. *Howard v. French-Brown Floors,* 542 S.W.2d 709, 712 (Tex.Civ.App.—Dallas 1976, no writ). We conclude, however, that the holding in *Tenneco* is still authoritative insofar as it precludes recovery of attorneys' fees under article 2226 in a suit based on a contract for construction of a finished product by the use of materials and services provided by others, as in the present case. This is evident from the discussion in *Tenneco* regarding materials furnished, which was unaf-

fected by the amendment. The court held that article 2226 did not cover materials used by the plaintiff in constructing the product, an oil well, since these materials were furnished to the plaintiff rather than to the defendant. *Tenneco*, at 820–21. If article 2226 will not support a recovery of attorneys' fees for materials furnished to plaintiff in constructing a product for defendant, then neither will it support recovery of an attorney's fee in a suit for services rendered to plaintiff in constructing a product for defendant. As interpreted by *Tenneco*, article 2226 permits recovery of attorneys' fees only against the party to whom the services, labor or materials are furnished. Here, the bulk of the services, work and materials were supplied to Dal-Mac, which expected to use them in fulfilling Dal-Mac's contract with Hanson Southwest to construct a shopping center. We conclude, therefore, that Dal-Mac is not entitled to attorneys' fees under article 2226. *Tenneco*, at 820–21; *Alpert v. Jarrell Carpentry Co.*, 510 S.W.2d 136, 140–41 (Tex.Civ.App.—Dallas 1974, no writ).

■ Our conclusion here is compelled by the language of the supreme court in *Tenneco*, which we consider to be still authoritative under the 1971 amendment to article 2226, except that corporations or other entities may recover attorneys' fees for services rendered by its employees or materials directly furnished by it. If we were construing amended article 2226 initially, we might arrive at a different result than that here by giving article 2226 a liberal, rather than a strict, construction. In this respect, counsel for Dal-Mac has furnished to us and to opposing counsel an article by Mr. Orrin W. Johnson, entitled "Article 2226 Revisited: Penetrating the Juridical Labyrinth," to be published in the May 1977 Texas Bar Journal. In that article, Mr. Johnson urges that article 2226 should be liberally construed, rather than strictly, in view of Tex.Rev.Civ. Stat.Ann. art. 10 § 8 (Vernon 1969), which expressly abolishes the rule that statutes in derogation of the common law must be strictly construed and provides that all statutes be liberally construed with a view to

effect their objectives and to promote justice. Although we agree with Mr. Johnson that the courts, in applying a strict construction to article 2226, have apparently overlooked article 10, our holding here is compelled by *Tenneco* and its antecedents.

Reversed and rendered in part and reversed and remanded in part.

## ON MOTION FOR REHEARING

In its motion for rehearing, Dal-Mac contends that we erred in stating that Hanson objected to the special issue concerning damages on the basis that it required the jury to pass on a *quantum meruit* rather than a contract measure of damages. After reviewing the record, we must concede that Hanson did not properly object on that basis to the special issue submitted. The objection was made to a proposed special issue proposed by Dal-Mac which was similar although not identical, to the issue actually submitted. The reversal of the judgment was, however, based upon the court's error in admitting the exhibit on which the jury apparently based its finding of damages. Consequently, our discussion of the special issue is for the purpose of aiding the trial court in the event of a retrial.

■ We also note that in our discussion of the measure of damages we did not construe the contract with respect to any profits that Dal-Mac may have had on the contract. Dal-Mac now asserts that it is entitled to a profit of eleven percent on all work performed and services rendered. We cannot agree. First, there is no evidence that Dal-Mac would have made a profit on the contract had it not been terminated by Dal-Mac for nonpayment of draw requests by Hanson Southwest. Second, the contract provision under which Dal-Mac seeks recovery does not specifically provide for profits. That provision states:

In the event the contractor shall terminate the . . . agreement and declare the same null and void, neither party shall thereafter be under further obligation to the other, *except that the con-*

*tractor shall have the right to receive and the owner shall be obligated to pay all sums due to the contractor for work previously performed and materials previously supplied to or ordered for the project.* (Emphasis added).

As we read this language, it only provides for restitution to the contractor "for work previously performed and materials previously supplied to or ordered for the project." No mention is made of profits. We conclude, therefore, that profits are not included within its provision. We do not pass, however, on the question of whether the contract excludes the usual measure of damages for breach by the owner, namely, the loss of the contractor's anticipated profit if the job had been completed (contract price, less expenditures allowing for materials on hand). Dal-Mac has not pleaded for such a recovery in this case or even for a pro rata profit on the work done, and there is no proof that such a profit would have been realized if the job had been completed.

Dal-Mac also attacks our holding that exhibit 47 was not admissible because its comptroller did not have knowledge that the services and materials represented by the invoices were actually furnished to the Masters Village project. It argues that this information was furnished to the comptroller by other Dal-Mac employees through the delivery tickets attached to the invoices, citing *University Savings & Loan Ass'n v. Security Lumber Co.*, 423 S.W.2d 287 (Tex. 1967). Assuming that it was shown that all invoices had delivery tickets attached, Dal-Mac still failed to satisfy the requirements of article 3737e. There is no testimony that a Dal-Mac employee with personal knowledge that the materials were furnished or the services were rendered made any notation on the delivery tickets or transmitted information to another employee for notation on the delivery ticket, nor is there any testimony that delivery tickets are made in the regular course of Dal-Mac's business. At best, the evidence shows that delivery tickets were attached to some invoices. This evidence is hearsay as to Hanson, without proof that they meet the requirements of article 3737e. By contrast, there was testimony in *Security Lumber Co.* concerning the usual course of business and the knowledge of employees preparing the documents.

Dal-Mac contends that Hanson did not object to plaintiff's exhibit 47 on the basis that the underlying documents were hearsay and that it has, therefore, waived the objection. Prior to offering plaintiff's exhibit 47, Dal-Mac's attorney questioned the comptroller concerning a few of the larger invoices which were summarized in plaintiff's exhibit 47. The first invoice which the comptroller testified about was from Southwest Steel and exceeded $170,-000. When the comptroller attempted to testify concerning this invoice, Hanson's counsel objected on the basis that he was testifying from documents not in evidence. The trial judge asked the witness if he was testifying from the records of his company and, when the witness said yes, overruled the objection. Hanson's attorney then objected that the invoices were the records of Southwest Steel, rather than of Dal-Mac. After the trial court overruled this objection, Hanson's attorney specifically called the trial court's attention to the fact that the invoices had not been proved up under article 3737e. We hold that a sufficient hearsay objection was leveled at this invoice. To the extent that plaintiff's exhibit 47 was based on this invoice, which was for almost half the total amount of plaintiff's exhibit 47, it stands on no better ground than the invoice itself. Once the objection was raised that the invoice was not shown to be a record of Dal-Mac but rather that of Southwest Steel, Hanson was not required to object again as to the summary insofar as the summary was based on this invoice. *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.*, 436 S.W.2d 889, 891 (Tex.1969). Since the verdict appears to have been based directly on plaintiff's exhibit 47 and that exhibit is only a summary of various invoices, including this $170,000 invoice from Southwest Steel, we adhere to our holding that admission of this exhibit was reversible error. It is, therefore, unnecessary to discuss whether a proper objection was raised as to the remaining underlying invoices.

Accordingly, we adhere to our original opinion and overrule Dal-Mac's motion for rehearing.