**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4673-17T2

MEDICAL TRANSCRIPTION
BILLING, CORPORATION
and MTBC ACQUISITION
CORPORATION,

      Plaintiffs-Appellants,

v.

RANDOLPH PAIN RELIEF
& WELLNESS CENTER, PC,

      Defendant-Respondent.

_____

      Argued January 30, 2019 – Decided April 23, 2019

      Before Judges Accurso, Vernoia and Moynihan.

      On appeal from Superior Court of New Jersey, Chancery Division, Somerset County, Docket No. C-012054-17.

      Keith M. Aurzada (Bryan Cave Leighton Paisner, LLP) of the Texas bar, admitted pro hac vice, argued the cause for appellants (Bryan Cave Leighton Paisner, LLP, attorneys; Courtney J. Peterson and Thomas J. Schell, on the briefs).

Anthony F. Maul (The Maul Firm, PC) of the California bar, admitted pro hac vice, argued the cause for respondent (Buttaci Leardi & Werner, LLC, and Anthony F. Maul, attorneys; John W. Leardi, of counsel; Anthony F. Maul, John W. Leardi, and Elizabeth A. Rice, on the brief).

PER CURIAM

Plaintiffs Medical Transcription Billing, Corp. (MTBC) and its subsidiary, MTBC Acquisition Corp. (MAC), appeal from a Chancery Division final judgment denying their request for an injunction barring defendant Randolph Pain Relief & Wellness Center, PC (Randolph) from proceeding to arbitration against them and finding Randolph may prosecute its claims under a billing services agreement against them in arbitration. Based on our review of the record in light of the applicable law, we affirm in part, reverse in part and remand for further proceedings.

I.

The underlying dispute in this matter arises under a January 2014 billing services agreement between Randolph and Millennium Practice Management Associates, Inc. (Millennium). Under the agreement, Millennium provided medical billing services to Randolph's medical practice. The billing services agreement required the arbitration of "[a]ny controversy or claim arising out of or relating to [the agreement] or the breach [t]hereof."

2

Plaintiffs are not parties to the billing services agreement. Randolph, however, claims plaintiffs assumed Millennium's obligations under the agreement. Randolph filed an arbitration proceeding against plaintiffs asserting they are successors in interest to Millennium's obligations under the billing services agreement and are liable for over $6 million in damages resulting from a breach of the agreement.

Plaintiffs filed a complaint in the Chancery Division seeking an injunction barring Randolph from arbitrating any claim against them arising under the billing services agreement.[1] Plaintiffs subsequently moved for entry of an injunction, claiming they had neither an obligation to arbitrate the dispute nor liability for the sums Randolph claims are due because they are not parties to the billing services agreement and have no liability for Millennium's obligations under the agreement. Randolph cross-moved for an order directing plaintiffs to proceed to arbitration, arguing plaintiffs are obligated to arbitrate the dispute on four separate grounds: plaintiffs expressly assumed Millennium's obligations under the billing services agreement; plaintiffs implicitly assumed Millennium's

---

[1] The parties agreed the pending arbitration proceeding would abide the outcome of the Chancery Division action.

obligations under the billing services agreement; plaintiffs had a de facto merger with Millennium and a continuity of Millennium's operations; and fraud.

The record developed before the Chancery Division shows that following its entry into the billing services agreement, Millennium was acquired by MediGain, LLC (MediGain), which assumed Millennium's billing services agreement with Randolph and thereafter performed billing services under the agreement.

MediGain later raised substantial sums of money by issuing notes to third parties. Payment of the notes was secured in part by MediGain's assets, including Millennium's billing services agreement with Randolph. When MediGain failed to meet its obligations under the notes, the note holders sold their interest in the notes to MAC. On October 3, 2016, MAC entered into a strict foreclosure agreement with MediGain and Millennium that, in pertinent part, transferred MediGain's assets to MAC in exchange for MAC's forgiveness of all sums due from MediGain on the outstanding notes. MAC's parent corporation, MTBC, is not a party to the strict foreclosure agreement and the agreement was not executed on MTBC's behalf.

In the strict foreclosure agreement, MAC "agree[d] to assume, pay, perform, and discharge promptly when payment or performance is due or

required . . . liabilities and obligations of [MediGain and Millennium]" including "all claims, liabilities and obligations due and owing as of [October 3, 2016] under each of the executory contracts (including [m]edical [b]illing [a]greements) listed on Exhibit C." The version of Exhibit C attached to the fully executed October 3, 2016 strict foreclosure agreement lists the Randolph billing services agreement as one of the executory contracts MAC expressly assumed.[2] The strict foreclosure agreement also contains a choice of law clause providing that "the rights and obligations" of the parties to the agreement "shall be governed by and interpreted, determined, and enforced in accordance with the internal laws of the State of Texas, without giving effect to principles of conflicts of laws."

On May 30, 2018, the court entered a judgment in Randolph's favor, denying plaintiffs' request to enjoin the arbitration and directing that Randolph and plaintiffs proceed to arbitration. In the court's written decision, it

---

[2] The record includes correspondence suggesting that the parties to the strict foreclosure agreement contemplated changing the list of contracts included on Exhibit C before and after the agreement was executed on October 3, 2016. However, the record is devoid of any evidence the parties agreed to change the list following the agreement's execution, and at oral argument counsel for plaintiffs and Randolph acknowledged the parties did not modify the list of executory contracts in Exhibit C following execution of the strict foreclosure agreement.

A-4673-17T2

determined MAC and MTBC were obligated to arbitrate Randolph's claims under the billing services agreement based on two findings. First, the court found "plaintiffs expressly assumed the billing contract" under the strict foreclosure agreement. Second, the court found MAC and MTBC assumed Randolph's billing services agreement by virtue of a de facto merger with, and continuity of the operations of, MediGain. The court concluded "MTBC, through MAC, acquired all [of MediGain's] assets requisite to carrying on [MediGain's] business unimpeded" and "effected a continuation of enterprise" based upon the standard for "mere continuation" articulated in Woodrick v. Jack J. Burke Real Estate, Inc., 306 N.J. Super. 61 (App. Div. 1997), and the deposition testimony of "MTBC's chief financial officer."

Because the court accepted Randolph's contention that plaintiffs are bound to arbitrate the underlying billing dispute based on an express assumption of the billing services agreement and a de facto merger and continuity of operations, the court did not address Randolph's suggested alternative bases for finding plaintiffs were bound by the billing services agreement: fraud and an implicit assumption of the billing services agreement. The court entered a judgment denying plaintiffs' request for an order enjoining the arbitration and directed that the matter proceed to arbitration. This appeal followed.

A-4673-17T2

II.

"The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." N.J.S.A. 2A:23B-6(b). "Orders compelling arbitration are deemed final for purposes of appeal." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013); see also R. 2:2-3(a). We review a judge's decision to compel or deny arbitration de novo because whether the parties have agreed to arbitrate is a question of law. Hirsch, 215 N.J. at 186. "[T]he 'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Waskevich v. Herold Law, PA, 431 N.J. Super. 293, 297 (App. Div. 2013) (quoting Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 573 (App. Div. 2007)).

When reviewing a motion to compel arbitration, the court applies a two-prong inquiry: (1) whether there is a valid and enforceable agreement to arbitrate disputes and (2) whether the dispute falls within the scope of the agreement. Martindale v. Sandvik, Inc., 173 N.J. 76, 86, 92 (2002). Here, the parties do not dispute that the billing services agreement includes a valid and enforceable agreement to arbitrate or that Randolph's claim presents a dispute within the scope of the arbitration clause. Instead, at issue is whether MAC and MTBC, who are not signatories to Randolph's billing services agreement,

7

assumed Millennium and MediGain's obligations under the agreement and are thereby bound by its arbitration clause. We separately address MAC's and MTBC's alleged arbitration obligations.

A. MAC

MAC argues the court erred by finding it expressly assumed Millennium and MediGain's obligations under the billing services agreement with Randolph. MAC contends for the first time on appeal that it did not assume any obligations under the billing services agreement because the strict foreclosure agreement required only its assumption of executory contracts. MAC contends that although the billing services agreement is listed on Exhibit C to the strict foreclosure agreement as an executory contract MAC agreed to assume, it did not assume the billing services agreement because the agreement was not an executory contract on October 3, 2016, when the strict foreclosure agreement was executed.

MAC contends the billing services agreement was not an executory contract on October 3, 2016, because on September 19, 2016, Randolph revoked MediGain's access to its billing system and thereby rendered MediGain's further performance under the billing services agreement impossible. In other words, MAC argues that although it expressly agreed to assume the executory contracts

listed on Exhibit C and the billing services agreement was included on the list, it did not assume the "liabilities and obligations" of the agreement because the billing services agreement was not an executory contract. We reject the argument for three separate but equally dispositive reasons.

First, "[a]ppellate review is not limitless. The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves." State v. Robinson, 200 N.J. 1, 19 (2009). We reject MAC's argument, raised for the first time on appeal, because it was not "properly presented to" the motion court and does not "go to the jurisdiction of the trial court or concern matters of great public interest."[3] Id. at 20 (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

Second, the argument ignores that in the strict foreclosure agreement, MAC, Millennium and MediGain expressly designated the billing services agreement as an executory contract that MAC assumed. MAC agreed to assume

---

[3] Before the trial court, MAC argued it did not expressly assume the billing services agreement because the version of Exhibit C that was attached to the strict foreclosure agreement when it was executed on October 3, 2016, was not a final list of executory contracts and that the parties anticipated modifying the list on Exhibit C. As noted, however, the record shows the billing services agreement was included on the Exhibit C annexed to the strict foreclosure agreement when it was executed on October 3, 2016, and it is undisputed the list was never modified or amended.

the executory contracts on Exhibit C and thus by definition the parties expressly acknowledged and agreed the billing services agreement was an executory contract.

We observe that although the trial court acknowledged plaintiffs argued the strict foreclosure agreement must be interpreted under Texas law, the court did not further address or decide the issue. It is also not possible to determine what state's law the court applied in deciding plaintiffs expressly assumed the liabilities and obligations of the billing services agreement under the terms of the strict foreclosure agreement. The court's analysis of the issue, which comprises five pages of its written opinion, does not cite to any law.

We agree, however, with plaintiffs' contention that the interpretation of the strict foreclosure agreement is governed by Texas law because the agreement provides for such. "When New Jersey is the forum state, its choice-of-law rules control." Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., LLC, 450 N.J. Super. 1, 34 (App. Div.), certif. denied, 231 N.J. 99 (2017). Under New Jersey choice of law principles, "[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice." Instructional Sys., Inc. v. Comput. Curriculum Corp., 130 N.J. 324, 341 (1992); see also N. Bergen Rex Transp., Inc. v. Trailer Leasing

10

Co., 158 N.J. 561, 568 (1999) ("New Jersey courts will uphold the contractual choice [of law] if it does not violate New Jersey's public policy" (quoting Instructional Sys., 130 N.J. at 341)); Kalman Floor Co. v. Jos. L. Muscarelle, Inc., 196 N.J. Super. 16, 21 (App. Div. 1984) (finding that under New Jersey choice of law principles, courts generally honor "a commercial agreement to be governed by the laws of a particular state").

Under Texas law, which we apply pursuant to the strict foreclosure agreement's choice of law provision, we give effect to a contract's plain language, Gen. Am. Indem. Co. v. Pepper, 339 S.W.2d 660, 661 (Tex. 1960), and will not rewrite an agreement in a manner inconsistent with its plain terms, see Cherokee Cty. Cogeneration Partners, LP v. Dynegy Mktg. & Trade, 305 S.W.3d 309, 312 (Tex. App. 2009) (explaining courts "may not rewrite the parties' contract or add to its language under the guise of interpretation").[4]

MAC's belated effort to excise the billing services agreement from the list of executory contracts it expressly assumed ignores the strict foreclosure agreement's plain language and otherwise requires an impermissible rewriting

---

[4]  The identical principles apply under New Jersey law.  See, e.g., GMAC Mortg., LLC v. Willoughby, 230 N.J. 172, 186 (2017) (explaining courts "enforce the contract according to its terms, giving those terms 'their plain and ordinary meaning,'" and "cannot 'rewrite a contract for the parties better than or different from the one they wrote for themselves'" (citations omitted)).

A-4673-17T2

of the contract MAC negotiated and to which it agreed. We reject the effort and are convinced the court correctly found MAC expressly assumed the "liabilities and obligations" of the billing services agreement, which MAC acknowledged and agreed constituted an executory contract within the meaning of the strict foreclosure agreement by its inclusion on Exhibit C.

The third reason we reject MAC's contention that it is not bound to arbitrate disputes arising under the billing services agreement is that its claim the billing services agreement is not an executory contract is incorrect as a matter of law. MAC argues the billing services agreement was not an executory contract on October 3, 2016, the date the strict foreclosure agreement was executed, because on September 19, 2016, Randolph terminated MediGain's access to Randolph's computer files and, as a result, MediGain could not thereafter provide any further billing services. MAC's argument ignores the record, the terms of the billing services agreement and the applicable law.

The record shows that on September 14, 2016, Randolph provided thirty days' notice to Millennium and MediGain that the billing services agreement was terminated.[5] The notice advised that "effective October 15, 2016[,]

---

[5]  The written notice of termination of the billing services agreement was authored and served by Randolph's counsel.

MediGain shall no longer perform any billing services for" Randolph. The notice also required that MediGain respond to "any balance bill issues" and "work in coordination with [Randolph] to transfer all billing functions" and "forward all correspondence" to Randolph through the October 15, 2016 termination of the agreement. Stated differently, Randolph provided notice the agreement would terminate on October 15, 2016, but reminded MediGain it had continuing obligations under the agreement until the termination date and insisted that MediGain perform those obligations until October 15, 2016.

To be sure, the record also shows Randolph terminated MediGain's access to the Randolph computer billing system on September 19, 2016, and, as result, MediGain could no longer generate new bills on Randolph's behalf. But, as Randolph declared in its September 14, 2016 termination notice, MediGain had continuing contractual obligations under the billing services agreement until the October 15, 2016 termination date, including an indemnification obligation.

The billing services agreement included an indemnification provision, pursuant to which Randolph and MediGain[6] agreed to indemnify each other

---

[6] As noted, although Randolph and Millennium were the original parties to the billing services agreement, MediGain assumed the contract when it acquired Millennium.

during the agreement's term. In its September 14, 2016 termination notice, Randolph invoked the indemnification provision and advised MediGain it would enforce the provision's obligations until October 15, 2016. Thus, despite the termination of MediGain's access to Randolph's computer system on September 19, 2016, the billing services agreement did not terminate until October 15, 2016, and Randolph made clear MediGain had ongoing material obligations to satisfy until the termination.

Under Texas law, "[a]n executory contract . . . is one that is still unperformed by both parties or one with respect to which something still remains to be done on both sides." B.L. Nelson & Assocs., Inc. v. City of Argyle, 535 S.W.2d 906, 909 (Tex. Civ. App. 1976).[7] Neither Randolph's September 14, 2016 notice nor its decision to deny MediGain access to its computer system terminated MediGain's contractual obligations prior to the October 3, 2016 execution of the strict foreclosure agreement. MediGain had continuing obligations, including the obligation to indemnify Randolph,

---

[7] Plaintiffs acknowledge in their initial brief on appeal that "[t]he definition of executory contract is the same under New Jersey law" as it is under Texas law. See, e.g., In re Nickels Midway Pier, LLC, 341 B.R. 486, 493 (D.N.J. 2006) (explaining an executory contract is one "under which the obligation[s] of both [parties] to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other" (citation omitted)).

following the October 3, 2016 execution of the strict foreclosure agreement, and Randolph similarly had contractual obligations to MediGain, including an indemnification obligation.  See, e.g., ConocoPhillips Co. v. Noble Energy, Inc., 462 S.W.3d 255, 274-75 (Tex. App. 2015) (finding that an agreement, which included continuing indemnity obligations, is an executory contract).  Thus, as a matter of law, the billing services agreement was an executory contract on October 3, 2016, and MAC expressly agreed to assume MediGain's "liabilities and obligations" under the contract when it executed the strict foreclosure agreement and included the contract on Exhibit C.  We therefore affirm the court's order denying MAC's request to enjoin the arbitration and directing that the arbitration proceed against MAC.[8]

B.  MTBC

The trial court concluded MTBC was compelled to arbitrate based on its findings that both plaintiffs expressly assumed Randolph's billing services agreement through the strict foreclosure agreement, and that there was a de facto

---

[8]  Because we are convinced the court correctly determined MAC expressly assumed the billing services agreement in the strict foreclosure agreement, we need not decide, for purposes of determining MAC's liablity, whether MAC is also bound by the billing services agreement because of its alleged de facto merger with, or continuity of the operations of, MediGain.

15

merger and continuity of operations between MTBC and MediGain. The trial court erred on both counts.

We first address the court's finding that MTBC expressly assumed the billing services agreement through the strict foreclosure agreement. Under Texas law, non-parties to a contract are generally not bound by a contract's terms unless "principles of contract law and agency" and "the rules of law or equity" otherwise bind them to the contract's obligations. Roe v. Ladymon, 318 S.W.3d 502, 511 (Tex. App. 2010). For example, a parent corporation may be bound by the contractual obligations of a subsidiary where there are grounds to pierce the corporate veil between the entities, Cementos de Chihuahua, SA de CV v. Intermodal Sales Corp., 162 S.W.3d 581, 585-86 (Tex. App. 2005); Bell Oil & Gas Co. v. Allied Chem. Corp., 431 S.W.2d 336, 339-40 (Tex. 1968), the parent is the alter ego of the subsidiary, Hanson Sw. Corp. v. Dal-Mac Constr. Co., 554 S.W.2d 712, 716-18 (Tex. Civ. App. 1977), or the subsidiary acts as the parent's agent, id. at 718-19.

New Jersey similarly adheres to the general principle that "an action on a contract cannot be maintained against a person who is not a party to it," Comly v. First Camden Nat'l Bank & Tr. Co., 22 N.J. Misc. 123, 127 (1944), but recognizes that a parent corporation may be liable for the obligations of its

subsidiary where the subsidiary acts as the "alter ego" of a parent corporation "to perpetrate fraud, to accomplish a crime, or otherwise to evade the law," Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983), or where a subsidiary acts as the agent of the disclosed parent, Alfano, 393 N.J. Super. at 569. Our Supreme Court has noted that "in the context of arbitration" agreements, Hirsch, 215 N.J. at 188, a parent corporation may be liable for a subsidiary's obligations under "'traditional principles' of state law allow[ing] a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third[-]party beneficiary theories, waiver and [estoppel],'" ibid. (quoting Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009)).

In finding plaintiffs expressly assumed the billing services agreement, the court did not make separate findings as to MAC and MTBC, recognize that MTBC is neither a party nor a signatory to the strict foreclosure agreement or cite to any law—Texas, New Jersey or otherwise—supporting its conclusion. See R. 1:7-4. The court did not make any findings of fact supporting its determination that MTBC is bound by a contract to which it is not a party, its decision on the issue is bereft of citation to the law it applied in reaching its decision and, although it noted plaintiffs argued Texas law should be applied, it

17

did not consider or decide that issue.[9] "[W]e are compelled to reverse and remand" when "the motion judge fail[s] to make . . . findings of facts or reach . . . conclusions of law, as mandated by Rule 1:7-4(a)." Estate of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 301 (App. Div. 2018). We therefore reverse the court's order finding MTBC expressly assumed the billing services agreement and its arbitration requirement and remand for further proceedings.

The court also concluded MTBC is bound by the billing services agreement because there was a de facto merger and continuity of operations between MTBC and MediGain. Based on our review of the record, we are convinced the evidence presented is insufficient to support the court's findings.

We first reject plaintiffs' contention the court erred by applying New Jersey law in its determination of whether MTBC is liable under the billing services agreement based on its purported merger with, or continuity of the operations of, MediGain. The issue does not arise under the strict foreclosure

_____

[9] As noted, Texas and New Jersey law appear generally similar on the issue of a corporate entity's liability for a contract to which it is not a party, but the dearth of fact findings and the lack of clarity in the record concerning MTBC's potential liability for MAC's obligations under the strict foreclosure agreement make it impossible for this court to decide the choice of law issue de novo. That is because the first step in a choice of law analysis is a determination as to whether there is a conflict between the states' laws, see P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008), and an assessment of whether the laws of the different states yield conflicting results is in part dependent on the applicable facts.

agreement, to which MTBC acknowledges and argues it is not a party. As correctly explained by the motion court, the de facto merger or continuity analysis with regard to MTBC's liability under the billing services agreement is dependent on the manner in which MTBC and MediGain operated, not the terms or execution of the strict foreclosure agreement. Thus, the strict foreclosure agreement, which requires the application of Texas law to issues arising under the agreement, has no application to a determination of whether MTBC assumed MediGain's obligations under the billing services agreement through its putative de facto merger with, or continuity of the operations of, MediGain.

Under New Jersey law, it is "well-established that where one company sells or otherwise transfers all of its assets to another company, the transferee of those assets is not ordinarily liable for the debts of the transferor company, including those arising out of the transferor's tortious conduct." Woodrick, 306 N.J. Super. at 72-73. Successor liability, however, can be established under four recognized exceptions:

> [W]here (1) the purchasing corporation expressly or impliedly agrees to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into

fraudulently in order to escape responsibility for such debts and liabilities.

[Id. at 73.]

Here, the record shows MAC, and not MTBC, purchased the assets of MediGain and, as noted, MAC expressly assumed the obligations and liabilities of the billing services agreement through its execution of the strict foreclosure agreement. Indeed, the court's determination that MTBC is bound by the billing services agreement is based on its finding that "MTBC, through the acquisitions of its wholly owned subsidiary, MAC, continued the business of MediGain and that the [strict foreclosure agreement] effected a continuation of enterprise." In its finding, however, the court erred by again ignoring that MTBC and MAC are separate corporate entities, MAC and not MTBC purchased MediGain's assets, and it was "proper [for MTBC] to establish [MAC] for the sole purpose of acquiring the assets of [MediGain] and continuing its business" without assuming MAC's liabilities and obligations. Ventron Corp., 94 N.J. at 501. We therefore reverse the court's determination that MTBC is liable under the billing services agreement because it had a de facto merger with MediGain or effected a continuation of MediGain's operations and remand for further proceedings on the issue.

To properly determine if continuity of operations or merger between MAC and MediGain provided an alternative basis to find MTBC liable for MediGain's obligations under the billing services agreement, the court was first required to determine if MAC, as the asset purchaser, either merged or had a continuity of operations with MediGain. The court did not make any findings to that effect or supporting such a determination. R. 1:7-4; Estate of Doerfler, 454 N.J. Super. at 301. In its discussion concerning continuity of operations and merger, the court did not make findings on MAC's purported continuation of MediGain's operations but nonetheless found MTBC continued MediGain's operations only "through" MAC.[10] The mere fact that MTBC's subsidiary MAC purchased MediGain's assets is insufficient to render MTBC liable for MAC's contractual liabilities. Ventron Corp., 94 N.J. at 501.

Even assuming MAC continued the operations of, or de facto merged with, MediGain, Randolph was required to present evidence sufficient to pierce the corporate veil between MTBC and MAC to establish MTBC is bound by the billing services agreement based on MAC's actions. See generally, Richard A.

---

[10] The court did not find, and we therefore do not consider, whether there is sufficient evidence supporting a determination that MTBC, without regard to MAC, directly effected a de facto merger with MediGain or continued MediGain's operations. The issue may be addressed on remand.

A-4673-17T2

Pulaski Constr. Co. v. Air Frame Hangars, Inc., 195 N.J. 457, 472 (2008) (explaining standard for piercing the corporate veil); Ventron Corp., 94 N.J. at 500-01 (same); see also Tung v. Briant Park Homes, Inc., 287 N.J. Super. 232, 240 (App. Div. 1996) ("[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving that the court should disregard the corporate entity."). The court did not consider or determine if the corporate veil between MAC and MTBC should be pierced or make any findings on the issue, R. 1:7-4; Estate of Doerfler, 454 N.J. Super. at 301, and, in our view, the record is insufficient to permit a dispositive determination of the issue.

We therefore reverse the court's finding that MTBC is bound by the arbitration requirements of the billing services agreement based on MAC's continuity of operations or de facto merger with MediGain, and remand for further proceedings. On remand, Randolph shall be free to present evidence and offer whatever legal arguments it deems appropriate to support its claim that MTBC is bound by MediGain's obligations under the billing services agreement, either through MAC or otherwise. See, e.g., BMC Software Belg., NV v. Marchand, 83 S.W.3d 789, 798 (Tex. 2002) ("The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities

22

must prove this allegation."); <u>Tung</u>, 287 N.J. Super. at 240 (finding the party seeking to pierce the corporate veil "bears the burden of proving that the court should disregard the corporate entity").

We observe that the court determined MTBC's purported liability under the billing services agreement on what constituted a motion for summary judgment, although not characterized by the parties or the court as such. The court did not conduct an evidentiary hearing and instead considered the papers submitted and determined MAC and MTBC were not entitled to an injunction as a matter of law. <u>See</u> <u>R.</u> 4:46-2(c) (providing that summary judgment shall be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment . . . as a matter of law"). If, on remand, the issue of MTBC's alleged assumption of the billing services agreement is again presented to the court on a summary judgment motion, the court shall require the parties' compliance with the summary judgment rules, <u>R.</u> 4:46-1 to -6, the court shall apply the summary judgment standard, <u>see generally</u> <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520 (1995), and the court shall make the requisite findings of fact and conclusions of law, <u>R.</u> 1:7-4; <u>Estate of Doerfler</u>, 454 N.J. Super. at

301; <u>Great Atl. & Pac. Tea Co. v. Checchio</u>, 335 N.J. Super. 495, 498 (App. Div. 2000).

We affirm the court's order compelling MAC to proceed to arbitration on Randolph's claims arising under the billing services agreement. We reverse the court's order compelling MTBC to proceed to arbitration on Randolph's claims arising under the billing services agreement and remand the matter as to MTBC for further proceedings.[11] We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11] We offer no opinion on Randolph's arguments before the motion court that plaintiffs are bound to arbitrate claims under the billing services agreement based on alleged fraud and an implicit assumption of the agreement. The motion court did not address those arguments. Randolph is free to renew the arguments on remand.

A-4673-17T2